**Kenneth R. Davis II**, OSB No. 971132
davisk@lanepowell.com
**Parna A. Mehrbani**, OSB No. 053235
mehrbanip@lanepowell.com
**LANE POWELL** PC
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone: 503.778.2121
Facsimile: 503.778.2200

**Daniel M. Petrocelli** (*pro hac vice*)
dpetrocelli@omm.com
**Mark A. Samuels** (*pro hac vice*)
msamuels@omm.com
**Jordan Raphael** (*pro hac vice*)
jraphael@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, Suite 1800
Los Angeles, California 90071
Telephone: 213.430.6000
Facsimile: 213.430.6407

Attorneys for Defendant Skechers USA, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ADIDAS AMERICA, INC.**, a Delaware corporation; **ADIDAS AG**, a foreign entity; and **ADIDAS INTERNATIONAL MARKETING B.V.**, a foreign entity, | Case No. 3:15-cv-01741-JE |
| Plaintiffs, | DEFENDANT SKECHERS USA, INC.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| **SKECHERS USA, INC.**, a Delaware corporation, | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

    A.    Skechers And Its Famous Trademarks And Products............................. 3

    B.    The Present Action.................................................................................. 4

ARGUMENT ........................................................................................................ 7

    I.    ADIDAS IS NOT LIKELY TO SUCCEED ON THE MERITS .......................... 8

    A.    Adidas' "Stan Smith" Claims Fail Because The "Stan Smith"
    Trade Dress Has No Secondary Meaning.................................................. 8

        1.    Adidas must satisfy its heavy burden of showing that
        consumers associate its alleged trade dress with a single
        source. ................................................................................................. 8

        2.    The survey of Skechers' expert, Ms. Butler, demonstrates
        that the claimed "Stan Smith" trade dress has no secondary
        meaning................................................................................................ 9

        3.    Adidas' failure to present any survey evidence on
        secondary meaning undermines its trade dress claim. ................. 11

        4.    The inconsistent look of adidas' "Stan Smith" shoes belies
        its trade dress claims. ...................................................................... 11

        5.    Adidas' non-exclusive use of its claimed trade dress
        elements also invalidates its claim of secondary meaning........... 14

        6.    Adidas' alleged "evidence" of secondary meaning is
        unsubstantiated and irrelevant........................................................ 19

    B.    Adidas' "Stan Smith" Claims Fail Because Its Asserted Trade
    Dress Is Functional. ................................................................................. 22

    C.    Adidas' Trademark Infringement Claims Fail Because There Is No
    Likelihood of Confusion. ........................................................................ 25

        1.    The adidas marks are weak................................................................ 25

        2.    The adidas and accused Skechers marks and product
        designs are not similar. .................................................................... 27

        3.    There is no actual confusion. ........................................................... 32

        4.    Skechers' serial branding negates any inference of an intent
        to deceive. .......................................................................................... 38

        5.    Footwear customers exercise a high degree of care.................... 40

        6.    Proximity of goods and likelihood of expansion favor
        Skechers. ............................................................................................ 40

        7.    Adidas and Skechers use different marketing channels............... 41

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

Page

D.   Skechers Is Likely To Succeed On Its Descriptive Fair Use
     Defense To Adidas' "Supernova" Claim. ................................................. 41

E.   Adidas' Trademark Dilution Claims Fail Because Its Marks Are
     Not Famous And There Is No Likelihood Of Dilution. .......................... 43

     1.   Adidas' "Stan Smith" trade dress and three-stripe mark are
          not famous. ................................................................................ 43

     2.   Adidas has not established likelihood of dilution. ....................... 45

II.   ADIDAS HAS FAILED TO ESTABLISH IRREPARABLE HARM ............... 47

III.  THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN
      SKECHERS' FAVOR ...................................................................................... 48

IV.   A PRELIMINARY INJUNCTION WILL NOT SERVE THE PUBLIC
      INTEREST ...................................................................................................... 49

CONCLUSION ......................................................................................................... 49

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Active Sports Lifestyle USA, LLC v. Old Navy, LLC*,
    No. SACV 12-572 JVS (Ex), 2014 WL 1246497 (C.D. Cal. Mar. 21, 2014) ....................... 48

*adidas Am., Inc. v. Kmart Corp.*,
    No. CV-05-120-ST, 2006 WL 2044857 (D. Or. June 15, 2006) ........................................... 45

*Am. Flange & Mfg. Co. v. Rieke Corp.*,
    80 U.S.P.Q.2d 1397 (T.T.A.B. 2006) ............................................................................ 10, 11

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979) ............................................................................................... 25

*Apple, Inc. v. Samsung Elecs. Co.*,
    920 F. Supp. 2d 1116 (N.D. Cal. 2013) ............................................................................... 8

*Aromatique, Inc. v. Gold Seal, Inc.*,
    28 F.3d 863 (8th Cir. 1994) .......................................................................................... 22, 38

*Artisan Mfg. Corp. v. All Granite & Marble Corp.*,
    559 F. Supp. 2d 442 (S.D.N.Y. 2008) ................................................................................. 27

*Aurora World, Inc. v. TY Inc.*,
    719 F. Supp. 2d 1115 (C.D. Cal. 2009) ............................................................................... 21

*Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
    457 F.3d 1062 (9th Cir. 2006) ............................................................................................. 23

*Avery Dennison Corp. v. Acco Brands, Inc.*,
    No. CV99-1877DT(MCX), 1999 WL 33117262 (C.D. Cal. Oct. 12, 1999) ......................... 19

*Bay State Sav. Bank v. Baystate Fin. Servs., LLC*,
    484 F. Supp. 2d 205 (D. Mass. 2007) ................................................................................. 10

*Big Island Candies, Inc. v. Cookie Corner*,
    269 F. Supp. 2d 1236 (D. Haw. 2003) ................................................................................. 19

*Cairns v. Franklin Mint Co.*,
    292 F.3d 1139 (9th Cir. 2002) ............................................................................................. 42

*Coach Servs., Inc. v. Triumph Learning LLC*,
    668 F.3d 1356 (Fed. Cir. 2012)..................................................................................... 43, 44

*Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.*,
    114 F. Supp. 2d 992, 1002-03 (S.D. Cal. 2000) ....................................................... 20, 22, 38

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

*Dall. Cowboys Football Club, Ltd. v. America's Team Props., Inc.*,
616 F. Supp. 2d 622 (N.D. Tex. 2009) .............................................................. 11

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
158 F.3d 1002 (9th Cir. 1998) ........................................................................ 23

*DISH Network Corp. v. FCC*,
653 F.3d 771 (9th Cir. 2011) .......................................................................... 49

*Dr. Seuss Enters. v. Penguin Book USA, Inc.*,
924 F. Supp. 1559 (S.D. Cal. 1996) ............................................................... 41

*Eli Lilly & Co. v. Revlon, Inc.*,
577 F. Supp. 477 (S.D.N.Y. 1983) ................................................................. 21

*Entrepreneur Media, Inc. v. Smith*,
279 F.3d 1135 (9th Cir. 2002) ........................................................................ 27

*Farmgirl Flowers, Inc. v. Bloom That, Inc.*,
No. 14-CV-05657-LHK, 2015 WL 1939424 (N.D. Cal. Apr. 28, 2015) ........................ 23, 25

*First Brands Corp. v. Fred Meyer, Inc.*,
809 F.2d 1378 (9th Cir. 1987) ..................................................................... 8, 21

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
826 F.2d 837 (9th Cir. 1987) .......................................................................... 22

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ............................................................................ 7

*Global Mfr. Grp., LLC v. Gadget Universe.com*,
417 F. Supp. 2d 1161 (S.D. Cal. 2006) ......................................................... 9, 11

*Glow Indus., Inc. v. Lopez*,
252 F. Supp. 2d 962 (C.D. Cal. 2002) ......................................................... 27, 30

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ...................................................................... 2, 47

*Horwitz v. Sw. Forest Indus., Inc.*,
604 F. Supp. 1130 (D. Nev. 1985) ................................................................. 49

*Idylwilde, Inc. v. Umpqua Feather Merchants, LLC*,
No. 3:13-CV-02009-HZ, 2014 WL 199201 (D. Or. Jan. 16, 2014) ........................ 47

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

Page(s)

*Imig, Inc. v. Electrolux Home Care Prods., Ltd.*, No. CV 05-0529(JO), 2008 WL
905898 (E.D.N.Y. Mar. 31, 2008) ....................................................................... 35

*In re Lucky Co.*,
209 U.S.P.Q. 422 (T.T.A.B. 1980) ...................................................................... 27

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
4 F.3d 819 (9th Cir. 1993) ............................................................................ 8, 19

*JL Beverage Co. v. Beam, Inc.*,
899 F. Supp. 2d 991 (D. Nev. 2012) .................................................................... 48

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
150 F.3d 1042 (9th Cir. 1998) .......................................................................... 19

*KP Permanent Make-Up, Inc. v. Lasting Impressions I, Inc.*,
408 F.3d 596 (9th Cir. 2005) ........................................................................... 25

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
988 F.2d 1117 (Fed. Cir. 1993) ................................................................. 31, 40, 41

*Larez v. City of L.A.*,
946 F.2d 630 (9th Cir. 1991) ........................................................................... 21

*Leatherman Tool Grp. v. Cooper Indus., Inc.*,
199 F.3d 1009 (9th Cir. 1999) ...................................................................... 23, 31

*Levi Strauss & Co. v. Blue Bell, Inc.*,
778 F.2d 1352 (9th Cir. 1985) .......................................................................... 8, 9

*Lindy Pen Co. v. Bic Pen Corp.*,
725 F.2d 1240 (9th Cir. 1984) .......................................................................... 27

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ........................................................................... 7

*Lyden v. adidas Am., Inc.*,
No. 3:14-CV-01586-MO, 2015 WL 566564 (D. Or. Feb. 10, 2015) .................................... 43

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................................. 36, 37

*Marcal Paper Mills v. Scott Paper Co.*,
290 F. Supp. 43 (D.N.J. 1968) .......................................................................... 42

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

*McNeil-PPC, Inc. v. Merisant Co.*,
No. CIV. 04-1090, 2004 WL 3316380 (D.P.R. July 29, 2004) .............................. 10

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
856 F.2d 1445 (9th Cir. 1988) ...................................................................... 26, 27

*Monster, Inc. v. Dolby Labs. Licensing Corp.*,
920 F. Supp. 2d 1066 (N.D. Cal. 2013) ............................................................ 11

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
No. 13-55575, 2015 WL 6161600 (9th Cir. Oct. 21, 2015) ............................ 39, 46

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) ......................................................................... 41

*One Indus., LLC v. Jim O'Neal Distrib.*,
578 F.3d 1154 (9th Cir. 2009) ......................................................................... 31

*Ovitsky v. Oregon*,
No. 3:12–CV-02250–AA, 2013 WL 5253162 (D. Or. Sept. 16, 2013)................. 48

*Playboy Enters., Inc. v. Netscape Commc'n Corp.*,
55 F. Supp. 2d 1070 (C.D. Cal.), *aff'd*, 202 F.3d 278 (9th Cir. 1999)............. 38, 48

*Reebok Int'l Ltd. v. Alon*,
5 U.S.P.Q.2d 1830 (C.D. Cal. 1987).................................................................. 31

*Reebok Int'l, Ltd. v. K-Mart Corp.*,
849 F. Supp. 252 (S.D.N.Y.), *vacated without opinion*, 33 U.S.P.Q.2d 1863
(S.D.N.Y. 1994).......................................................................................... 45, 46

*Rose Art Indus., Inc. v. Swanson*,
235 F.3d 165 (3d Cir. 2000).............................................................................. 12

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
668 F.3d 677 (9th Cir. 2012) ........................................................................... 22

*Skechers U.S.A., Inc. v. Vans, Inc.*,
No. CV 07-01703, 2007 WL 4181677 (C.D. Cal. Nov. 20, 2007)................... 34, 36

*Sleash, LLC v. One Pet Planet, LLC*,
No. 3:14-CV-00863-SI, 2014 WL 4059163 (D. Or. Aug. 15, 2014)................... 48

*Spark Indus., LLC v. Kretek Int'l, Inc.*,
No. CV 14-5726-GW ASx, 2014 WL 4365736 (C.D. Cal. Aug. 28, 2014)........... 22

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

Page(s)

*Taylor v. Sturgell*,
 553 U.S. 880 (2008)..................................................................... 45

*THOIP v. Walt Disney Co.*,
 690 F. Supp. 2d 218 (S.D.N.Y. 2010)........................................ 36

*T-Mobile US, Inc. v. AIO Wireless LLC*,
 991 F. Supp. 2d 888 (S.D. Tex. 2014) ....................................... 10

*Toho Co. v. Sears, Roebuck & Co.*,
 645 F.2d 788 (9th Cir. 1981) ...................................................... 38

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
 532 U.S. 23 (2001)................................................................. 22, 23

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
 368 F. Supp. 2d 1121 (W.D. Wash. 2005).................................. 48

*W. Publ'g Co. v. Rose Art Indus.*,
 910 F.2d 57 (2d Cir. 1990).......................................................... 42

*Wal-Mart Stores, Inc. v. Samara Bros.*,
 529 U.S. 205 (2000)....................................................................... 8

*Walter v. Mattel, Inc.*,
 31 F. Supp. 2d 751 (C.D. Cal. 1998) .......................................... 31

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)........................................................................... 8

**STATUTES**

15 U.S.C. § 1115(b)(4) ...................................................................... 42

15 U.S.C. § 1125(a)(3)....................................................................... 22

15 U.S.C. § 1125(c) ........................................................................... 43

15 U.S.C. § 1125(c)(2)(A) ................................................................. 43

15 U.S.C. § 1125(c)(2)(B) ................................................................. 46

**OTHER AUTHORITIES**

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ................ *passim*

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE
MANUAL ON SCIENTIFIC EVIDENCE (3d ed.)...........................................................................9

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

## <u>INTRODUCTION</u>

adidas' Motion for Preliminary Injunction is a hollow and misguided attempt to intimidate and impede a quickly growing rival. Based on factual allegations it cannot support, adidas accuses Skechers of infringing trade dress rights adidas does not have and asserts likelihood of confusion and dilution where none exist, all while turning a blind eye to binding legal precedent that undermines its motion. Simply put, adidas seeks to extend its trademark rights far beyond their lawful bounds and prevent Skechers from fair, legitimate competition.

adidas' claims premised on Skechers' alleged infringement and dilution of its unregistered "Stan Smith" trade dress fail because adidas has no such rights: adidas has failed to carry its burden to establish the threshold requirements of secondary meaning and nonfunctionality, without which it has no legally protectable trade dress rights.

Although adidas undeniably had the time and resources to conduct a secondary meaning survey—the most common, direct, and persuasive method of establishing secondary meaning— adidas' motion is devoid of any such evidence. Skechers, meanwhile, obtained its own independent survey which establishes that the asserted "Stan Smith" trade dress *has no secondary meaning*. And it should come as no surprise that the consuming public does not associate the design of the "Stan Smith" with a single source, let alone adidas. The "Stan Smith" was discontinued between 2012 and 2014, and since its reintroduction adidas has flooded the market with shoes bearing the same name in dozens of designs, colors, and materials—belying any claim of a cohesive, or recognizable, "trade dress." adidas further undermines its case by claiming protection for design elements—such as a white upper, perforations, and colored (or green) heel patches—that are common to tennis-style and athletic sneakers, and not exclusive to the "Stan Smith." Lacking any survey evidence establishing secondary meaning, adidas resorts instead to baseless. unsupportable hearsay and innuendo channeled through its declarants in its attempt to establish secondary meaning through sales and advertising. For example, as "evidence" that adidas spent "tens of millions of dollars" promoting Stan Smith and sold "more

PAGE 1 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

than 40 million pairs" of the shoes worldwide, adidas relies upon the declaration of adidas employee Brandon Beaty. ECF No. 8 ¶¶ 11-12. But in a court-ordered deposition, Mr. Beaty conceded that he did not write his declaration (and was not sure who did), that the "tens of millions of dollars" figure was based on "guesstimations" he could not support, and that the "40 million pairs" figure was a "sound bite" by another adidas employee he merely parroted but could not defend based on any personal knowledge or evidence. Declaration of Jordan Raphael ("Raphael Decl."), Exs. 4a-4b (Beaty Dep.) at 14:15-18; 98:24-100:4, 106:5-108:21.[1]

Nor does adidas even attempt to establish the other threshold requirement for protectable trade dress, namely, nonfunctionality. To the contrary, the claimed "Stan Smith" trade dress comprises utilitarian improvements to athletic shoes made in the 1960s and 1970s, such as a perforated upper, which adidas founder Adolf Dassler himself described in a filed U.S. patent as a customary method of improving ventilation.

Moreover, adidas fails to establish that any of the accused Skechers footwear are likely to cause confusion or dilution in the marketplace. To the contrary, Skechers' pervasive and prominent use of its own famous trademarks and logos on its products and packaging, the narrow scope of protection (if any) for adidas' claimed marks, the crowded field of similar marks, and the differences between the accused products and adidas' products make confusion or dilution unlikely.

Finally, adidas inexcusably ignores controlling law on the equitable requirements for obtaining a preliminary injunction. Binding Ninth Circuit precedent holds that adidas must establish irreparable harm—courts may not presume it merely from a showing of trademark infringement. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1242 (9th Cir. 2013). Despite *Herb Reed*'s clear pronouncement that irreparable harm may not be presumed, speculative, or "grounded in platitudes," adidas ignores the case entirely in its motion, relying

---

[1] Concurrently herewith, Skechers moves to strike portions of Mr. Beaty's declaration based on lack of personal knowledge and hearsay.

PAGE 2 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

exclusively on cases that predate (and apply a presumption that was expressly overruled by) *Herb Reed* and presenting no evidence whatsoever of irreparable harm.

For the reasons discussed below, Skechers respectfully requests that the Court deny adidas' motion.

<u>**STATEMENT OF FACTS**</u>

**A.  Skechers And Its Famous Trademarks And Products.**

Skechers is an American footwear company headquartered in Manhattan Beach, California, that designs, develops, and markets footwear for men, women, and children. Declaration of Kathy Kartalis ("Kartalis Decl.") ¶¶ 1, 3.  It is the second largest footwear company in the United States, behind only Nike.  *Id*. ¶ 3.  Skechers' products are sold at department and specialty stores across the country, as well as in its network of company-owned and -operated Skechers retail stores.  *Id*. ¶ 4.

Skechers distinguishes itself from its rivals in the footwear industry—a highly competitive, trend-driven business in which dozens of companies release thousands of new styles each year seeking to capitalize on the same market trends—by adopting a "serial branding" strategy.  *Id*. ¶¶ 5-6.  Since its founding more than 20 years ago, it has heavily and consistently branded its shoes, packaging, and retail stores with the trademark SKECHERS®.  *Id*. ¶ 6. Skechers has developed a family of related SKECHERS® trademarks, brands, and logos, such as SKECHERS® RELAXED FIT®, SKECHERS ON-THE-GO®, and SKECHERS SPORT®.  *Id*. ¶ 7; Declaration of Philip G. Paccione ("Paccione Decl.") ¶ 3 & Ex. 1.  Skechers also owns trademark registrations for a variety of logos incorporating an "S" symbol.  Paccione Decl. ¶ 3 & Ex. 1.  In a process called "Skecherizing," Skechers' designers transform market trends into unique products with designs and packaging that prominently feature Skechers' famous marks and logos.  Kartalis Decl. ¶ 9.

PAGE 3 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## B. The Present Action.

On September 14, 2015, adidas commenced this action, filing with its Complaint a Motion for Preliminary Injunction. ECF Nos. 1 ("Compl."), 6 ("Mot."). It did so without so much as a phone call, cease-and-desist letter, or other pre-suit notice, and without seeking to resolve its issues with Skechers informally under the terms of the parties' prior agreements.[2] Paccione Decl. ¶¶ 5-10.

adidas contends that three Skechers products violate three of its claimed trademark rights.

First, adidas accuses the SKECHERS® Onix, a "retro" or "throwback" women's shoe with a classic tennis-shoe profile and styling evocative of tennis shoes from the 1960s and 1970s. Kartalis Decl. ¶ 11. The Onix, which has been sold since at least July 2015, features several design elements common to classic tennis-style shoes, such as a white upper, a colored heel patch, perforations on the upper, and a white outsole. *Id*. It also contains numerous Skechers branding and logo elements, including the SKECHERS® trademark on the heel patch, tongue, insole, and outsole, and a Skechers "S" logo on the heel patch. *Id*. ¶ 13.

---

[2] adidas and Skechers have a history of disputes over footwear designs, all of which were resolved by agreements between the parties. Paccione Decl. ¶¶ 5-7; ECF No. 9-5. None of those agreements involved Skechers styles or designs at issue in the present action, and they all included express denials of adidas' allegations and/or acknowledgments that Skechers was not admitting infringement of adidas' intellectual property rights. Paccione Decl. ¶¶ 6-9; ECF No. 9-5 at 1. In particular, disputes between adidas and Skechers that occurred between 2008 and 2013 were resolved peacefully with simple agreements that, without any admission of fault or liability, also included: (1) reasonable sell-off periods enabling Skechers to liquidate its inventory without incurring losses; (2) 30-day "cooling-off" provisions, under which adidas was to provide written notice of any future complaints so the parties could try to resolve them without litigation; and (3) confidentiality provisions. Paccione Decl. ¶¶ 6-9.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200



**Table 1: SKECHERS® Onix**

Declaration of Sarah Butler ("Butler Decl."), Ex. 2 ("Butler Onix Survey") at 12.

adidas contends that the SKECHERS® Onix infringes and dilutes adidas' purported unregistered trade dress rights in the product design of adidas' "Stan Smith" shoe, which it defines as comprising:

> [A] classic tennis-shoe profile with a sleek white leather upper, three rows of perforations in the pattern of the well-known Three-Stripe Mark, a defined stitching across the sides of each shoe

enclosing the perforations, a raised mustache-shaped colored heel patch, which often is green, and a flat tonal white rubber outsole.

Mot. at 3.

Second, adidas accuses a design on the upper of the SKECHERS® RELAXED FIT® Cross Court TR shoe of infringing and diluting adidas' three-stripe mark. *Id.* at 4. The SKECHERS® RELAXED FIT® Cross Court TR, which has been sold since at least October 2014, is a men's cross-training shoe that also incorporates numerous of Skechers' famous trademarks and logos, including on the upper, the heel patch, the tongue, and the insole. Kartalis Decl. ¶¶ 15, 17-18.

**Table 2: SKECHERS® RELAXED FIT® Cross Court TR**



Butler Decl., Ex. 3 ("Butler Cross Court Survey") at 12.

Third, adidas asserts that Skechers' use of a product style name in connection with certain women's SKECHERS® RELAXED FIT® shoes violates adidas' rights in the word mark

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

"Supernova."  Mot. at 5.  The term "supernova" appears nowhere on the accused shoes, which have been sold since at least February 2015 and are also heavily branded with Skechers' trademarks and logos.  Kartalis Decl. ¶¶ 19-20.  Skechers uses "supernova" descriptively in the shoe's style name (and not as a trademark) to describe the vibrant "celestial" supernova-style coloring of the shoe.  *Id.* ¶ 19.

**Table 3:  SKECHERS® RELAXED FIT® (Supernova Style)**



Kartalis Decl. ¶ 19.

<u>**ARGUMENT**</u>

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  Mandatory preliminary injunctions like the one adidas seeks here are subject to an even higher standard and "should not issue in doubtful cases." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  To prevail on its motion, adidas must make four showings: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable

PAGE 7 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As Skechers demonstrates below, adidas fails to satisfy any of these requirements.

I. **ADIDAS IS NOT LIKELY TO SUCCEED ON THE MERITS**

    A. **Adidas' "Stan Smith" Claims Fail Because The "Stan Smith" Trade Dress Has No Secondary Meaning.**

        1. **Adidas must satisfy its heavy burden of showing that consumers associate its alleged trade dress with a single source.**

Secondary meaning, also known as acquired distinctiveness, is a threshold requirement for any infringement or dilution claim premised on unregistered trade dress. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000); *Apple, Inc. v. Samsung Elecs. Co.*, 920 F. Supp. 2d 1116, 1122-23 (N.D. Cal. 2013). As adidas concedes, it "has never sought or obtained a trademark registration" for the claimed "Stan Smith" trade dress. ECF No. 46 at 2. Therefore, under Supreme Court precedent, adidas' trade dress claims fail absent proof of secondary meaning. *Wal-Mart*, 529 U.S. at 216.

To establish secondary meaning, adidas must show that a "substantial segment" of "the purchasing public associates the dress with a single producer or source rather than just the product itself." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987). adidas' burden to show secondary meaning of its unregistered "Stan Smith" product design is a heavy one because "product design almost invariably serves purposes"—such as utility or mere visual appeal— "other than source identification." *Wal-Mart*, 529 U.S. at 213.

In assessing secondary meaning, courts consider several factors, including expert surveys, sales, advertising, how the alleged trade dress has been used, and whether use of the dress has been exclusive. *Levi*, 778 F.2d at 1358; *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824-25 (9th Cir. 1993). Among these, expert surveys of consumers "provide the

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

most persuasive evidence on secondary meaning," especially in trade dress cases. *Levi*, 778 F.2d at 1358; *Global Mfr. Grp., LLC v. Gadget Universe.com*, 417 F. Supp. 2d 1161, 1170-73, 1176 (S.D. Cal. 2006).

> **2.    The survey of Skechers' expert, Ms. Butler, demonstrates that the claimed "Stan Smith" trade dress has no secondary meaning.**

adidas made the strategic decision to file a motion for preliminary injunction in support of which it was required to establish secondary meaning, but to present no survey evidence to attempt to meet that burden. Skechers, in contrast, has taken the issue head on.

Skechers' expert, Sarah Butler, is an experienced consumer survey expert who has conducted surveys for more than 15 years. *See* Butler Decl., Ex. 1 ("Butler Secondary Meaning Survey"). Ms. Butler conducted a survey to test whether the combination of design elements claimed by adidas to comprise the "Stan Smith" trade dress has secondary meaning. *Id.* ¶ 5.

A secondary meaning survey measures whether respondents "use [a] designation or trade dress to identify a single source." J. Thomas McCarthy, McCARTHY ON TRADEMARKS & UNFAIR COMPETITION ("McCARTHY") § 32:191. A properly conducted survey includes a test stimulus, a product containing the trade dress being measured for association with a single source, and a control stimulus—that is, a product that "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic" (*i.e.*, the trade dress) "whose influence is being assessed." Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE ("Diamond") 399 (3d ed.). The control—which acts like a "placebo" in a clinical drug trial—eliminates responses in the test group that are unrelated to the specific combination of trade dress elements being assessed, such as those based on a common color or style, or guessing. *Id.* at 397-401; Butler Secondary Meaning Survey ¶¶ 30-31. This is done by subtracting the association level in the control group from the association level in the test group to determine a net single-source association level. Butler Secondary Meaning Survey ¶ 38.

PAGE 9 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

In Ms. Butler's secondary meaning survey, her test images showed a "Stan Smith" sneaker from four different angles, with the "adidas" and "Stan Smith" brand indicia removed. *Id*. ¶¶ 28-29 & Ex. C. This enabled her to test only the asserted trade dress. *Id*. Her control images were identical to the test images, but for the alleged trade dress—*i.e.*, the three rows of perforations in the three-stripe pattern, the defined stitching enclosing the perforations, and the green heel patch. *Id*. ¶¶ 31-32 & Ex. C. The control sneaker also had an "off-white" outsole, as compared to the "flat white" outsole of the test sneaker. *Id*.



| Table 4: Butler Secondary Meaning Survey Stimuli (Example Images) | |
|:---:|:---:|
| **Test Stimulus** | **Control Stimulus** |

Net association levels of 50% or higher may support secondary meaning, but net levels below 20% are deemed "marginal" and "contradict" a claim of secondary meaning. *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 906-08 (S.D. Tex. 2014) (survey showing 55% association of color with one company evidence of secondary meaning); *McNeil-PPC, Inc. v. Merisant Co.*, No. CIV. 04-1090, 2004 WL 3316380, at *10 (D.P.R. July 29, 2004) (58.5% level of recognition of trade dress); *Am. Flange & Mfg. Co. v. Rieke Corp.*, 80 U.S.P.Q.2d 1397, 1414 (T.T.A.B. 2006) (19% "contradicts" claim of secondary meaning); *Bay State Sav. Bank v. Baystate Fin. Servs., LLC*, 484 F. Supp. 2d 205, 217 (D. Mass. 2007) (percentages "in the thirties" are considered marginal).

In Ms. Butler's secondary meaning survey, only a ***net 4%*** of respondents indicated they associate the design of the "Stan Smith" sneaker with one brand. Butler Secondary Meaning Survey ¶ 38.[3] Her survey results thus demonstrate that consumers are no more likely to associate

---

[3] 40.5% association for the test - 36.5% association for the control = 4% net association. *Id*.

the asserted "Stan Smith" trade dress with a single source, than they would any white tennis-style sneaker (*i.e.*, the control). The survey's net 4% one-brand association rebuts any claim that a "substantial segment" of consumers associate the claimed "Stan Smith" trade dress with a single source, and affirmatively disproves adidas' claim of secondary meaning. *Id.* ¶ 43; *Am. Flange*, 80 U.S.P.Q.2d at 1414; *Dall. Cowboys Football Club, Ltd. v. America's Team Props., Inc.*, 616 F. Supp. 2d 622, 641 (N.D. Tex. 2009) (6.8% in secondary meaning survey is "outside the percentages accepted by courts").

### 3. Adidas' failure to present any survey evidence on secondary meaning undermines its trade dress claim.

Although adidas regularly conducts research on consumer perceptions of its products, its Director of Sport Style Brand Marketing admitted that he was not aware of any surveys, studies, or other internal adidas research showing "the purchasing public associates the Stan Smith trade dress with adidas." Raphael Decl., Exs. 4a-4b (Beaty Dep.) at 122:21-123:15. adidas undoubtedly had the means and the opportunity to do such a survey.[4] Its failure to do so raises an inference that the survey evidence would have been (or was) unfavorable and undermines its claim of secondary meaning for the alleged "Stan Smith" trade dress. *See Monster, Inc. v. Dolby Labs. Licensing Corp.*, 920 F. Supp. 2d 1066, 1072 (N.D. Cal. 2013); *Global*, 417 F. Supp. 2d at 1170-73, 1176 (trade dress claim failed as a matter of law where, *inter alia*, plaintiff failed to conduct a secondary meaning survey).

### 4. The inconsistent look of adidas' "Stan Smith" shoes belies its trade dress claims.

The results of Ms. Butler's survey showing no secondary meaning and adidas' failure to provide any consumer evidence to the contrary are unsurprising given the "Stan Smith" shoe itself. The shoe is the product of a sponsorship deal with the former American tennis champion, Stan Smith (Mot. at 9), and thus relies on the name and notoriety of Mr. Smith—more so than

---

[4] In fact, adidas managed to conduct a survey on likelihood of confusion in just one week, "[b]etween October 1 and 8, 2015." ECF No. 45 at 3.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

any specific design elements or dress—to sell and promote product. Additionally, according to adidas' own submissions, the shoe "has seen its share of hardships" over the years and was even pulled off shelves from 2012 through 2014. ECF No. 8-1 at 3.

Perhaps more importantly, adidas' "Stan Smith" comes in a wide variety of styles, designs, colors, and materials—contradicting any claim of a cohesive, source-identifying "Stan Smith" trade dress. *See Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 172-73 (3d Cir. 2000) (requiring a "consistent overall look" for trade dress claims based on the design of a series of products); *see also* MCCARTHY § 8:5.50. For example, the adidas website features 26 different "Stan Smith" men's shoes, 11 different "Stan Smith" women's shoes, and 4 different "Stan Smith" kids' shoes. Raphael Decl., Exs. 4a-4b (Beaty Dep.) at 31:20-32:3, 32:24-33:9. As shown in Table 5 below, "Stan Smith" shoes feature a riot of upper materials, upper colors, outsole colors, and heel patch colors (*id*. at 42:14-44:17); and dozens of these shoes lack one or more of the design elements that adidas claims for its trade dress. Indeed:

- At least 28 "Stan Smith" shoes do not have a white upper. *Id.* at 34:12-18.
- At least 31 "Stan Smith" shoes do not have a green heel patch. *Id*. at 37:4-20.
- At least 8 "Stan Smith" shoes do not have a white outsole. *Id*. at 37:25-39:3.
- At least 5 "Stan Smith" shoes do not have perforations on the side of the upper in a three-stripe pattern. *Id*. at 50:7-11, 51:3-9, 52:12-17, 63:17-64:2, 67:4-8.

PAGE 12 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION



**Table 5: Examples of adidas "Stan Smith" Shoes**

Raphael Decl., Exs. 1-3; 5.

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

**5.** **Adidas' non-exclusive use of its claimed trade dress elements also invalidates its claim of secondary meaning.**

adidas admits that it never sought to enforce any rights in its claimed "Stan Smith" trade dress in the past five years, and has presented no evidence that it *ever* tried to enforce such rights. ECF No. 46 at 2. The reason for adidas' inaction is simple: the elements of the asserted "Stan Smith" trade dress—a white leather upper, a flat white outsole, rows of perforations, defined stitching, and a green (or colored) heel patch—are common in the shoe industry and thus not protectable. "Use by third parties is evidence of a lack of secondary meaning"—that is, "evidence that distinctiveness in one seller is lacking." MCCARTHY § 15:27. Even if product designs are not identical, but merely similar, third party use of the product designs will "weaken any consumer recognition and association of that mark with a single alleged owner." *Id*.

For many decades, footwear companies have sold shoes that are similar to adidas' asserted trade dress because they incorporate white leather uppers, white outsoles, perforations on the uppers, defined stitching, and green (or colored) heel patches. The tables on the next several pages depict historical and current examples of third-party shoes with the following elements adidas seeks to claim as its trade dress: a white upper, a flat white outsole, perforations on the upper, defined stitching, and/or green or colored heel patches.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200



**Table 6: Historical Shoe Styles Similar to Claimed Trade Dress**

| North Star (1970s) | Chex Champion (1975) | Puma (1980/81) |
| Stacy Adams (1982) | Power (1984) | TBS (1987) |
| TBS (1987) | Tecnica (1988) | Wilson (1989) |
| Lotto (1990) | Airwalk (1996) | Etnies (2002) |

Declaration of Phillip Nutt, Exs. 1-13.



**Table 7: Current Third-Party Shoes with White Uppers and/or Flat White Outsoles**

| | | |
|---|---|---|
| Levi's | Coach | Lacoste |
| Thorocraft | Vans | K-Swiss |
| Nike | Tretorn | Converse |

Raphael Decl., Exs. 6-14.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

**Table 8: Current Third-Party Shoes with Perforations on Upper and/or Defined Stitching**



| | |
|---|---|
| Le Coq Sportif / Arthur Ashe | Fred Perry |
| K-Swiss | Puma |
| K-Swiss | Nike |
| Nike | Puma |
| Rockport | Loewe |

Raphael Decl., Exs. 12; 15-23.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200



**Table 9: Current Third-Party Shoes with Green or Colored Heel Patches**

| | | |
|---|---|---|
| Lacoste | Asics | Golden Goose |
| New Balance | New Balance | Fred Perry |
| Gucci | Lacoste | U.S. Polo Ass'n |
| Nike | Puma | Le Coq Sportif / Arthur Ashe |

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200



**Table 9: Current Third-Party Shoes with Green or Colored Heel Patches**

| | | |
|---|---|---|
| K-Swiss | K-Swiss | K-Swiss |
| Fred Perry | Lacoste | Levi's |

Raphael Decl., Exs. 24-41.

The common, extensive use by third parties of the elements that adidas claims as its trade dress shows that adidas' product design "is so common in the industry or in the marketplace that it cannot be said to identify any particular source," and further weighs heavily against a finding of secondary meaning. *Big Island Candies, Inc. v. Cookie Corner*, 269 F. Supp. 2d 1236, 1244, 1248 (D. Haw. 2003); *see also Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1049 (9th Cir. 1998); *Int'l Jensen*, 4 F.3d at 824-25; *Avery Dennison Corp. v. Acco Brands, Inc.*, No. CV99-1877, 1999 WL 33117262, at *12-13 (C.D. Cal. Oct. 12, 1999).

### 6. Adidas' alleged "evidence" of secondary meaning is unsubstantiated and irrelevant.

Lacking any direct consumer survey evidence of secondary meaning, adidas instead seeks to rely on sales of its "Stan Smith" sneaker, claiming that the shoe has "sold more than 40 million pairs worldwide." Mot. at 9. Its claimed sales figure is utterly unsubstantiated. adidas' "evidence" for this figure is a statement in the declaration of Mr. Beaty, adidas' witness on

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

secondary meaning. *Id*. But Mr. Beaty admitted that his only source for the "40 million" number was a "sound bite" from another adidas employee and that he had not reviewed any financial information that verified this figure. Raphael Decl., Exs. 4a-4b (Beaty Dep.) at 98:24-100:4. Mr. Beaty also admitted that he did not know the figures that actually matter to the proposition for which they are advanced: how many "Stan Smith" shoes **with the asserted trade dress** (nor even "Stan Smith" shoes overall) had been sold in the United States. *Id*. at 100:5-8, 101:1-4.[5] Mr. Beaty likewise had no knowledge of how many pairs of "Stan Smith" shoes with the claimed trade dress were sold in the United States in 2015, 2014, 2013, 2012, or in any year before that. *Id*. at 101:8-102:9.[6]

Even if Mr. Beaty's claimed sales figures were properly supported (which they are not), sales alone are inadequate to show secondary meaning, particularly where, as here, a product design is asserted as trade dress. *Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1002-03 (S.D. Cal. 2000). adidas must demonstrate in addition "how its alleged sales success" has created "secondary meaning in the minds of the consuming public." *Id*. at 1004. adidas has failed to draw the necessary connection—its motion contains sales claims about the "Stan Smith," but nowhere shows how those (unproven) sales have resulted in secondary meaning.

Mr. Beaty's other assertion—that adidas has spent "tens of millions of dollars promoting the product and [] appearance" of the purported "Stan Smith" trade dress (Mot. at 9)—proved to be equally unsupported. Mr. Beaty was aware of, at most, a few hundred thousand dollars spent by his business unit to promote the "Stan Smith" in 2014. Raphael Decl., Exs. 4a-4b (Beaty Dep.) at 112:12-20. But he did not know how much his business unit or any other adidas

---

[5] Mr. Beaty was likewise unable to say how many pairs of the asserted trade dress "Stan Smith" shoes have been sold worldwide. *Id*. at 101:5-7.
[6] At his deposition, Mr. Beaty could only recall that "Stan Smith" shoes had sold a few hundred thousand units in 2015 and 2014. But he did not know whether those sales figures related to "Stan Smith" shoes with the asserted trade dress, or the full collection of "Stan Smith" footwear (*see supra* Table 5). *Id*. at 82:18-84:12.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

department had spent on promotion in 2015, 2013, 2012, or in any year before that.  *Id*. at 112:25-114:7.  Mr. Beaty also admitted that the only support for the "tens of millions of dollars" in advertising figure provided in his declaration consisted of "assumption[s]" and "guesstimations."  *Id.* at 108:6-21.

Notably, adidas has provided no examples of advertising for the "Stan Smith" shoe (*id.* at 104:5-8), let alone the type of "image" or "look for" advertising emphasizing its asserted trade dress that is necessary for secondary meaning.  *First Brands*, 809 F.2d at 1383 (no secondary meaning where the plaintiff's millions of dollars on advertising did not "stress[] the color and shape" of the claimed trade dress).  By contrast, two recent adidas promotional videos are stunning counter-examples of such "look for" advertising: both prominently feature "Stan Smith" styles with looks, designs, and colors that differ dramatically from the asserted trade dress.  Raphael Decl., Exs. 42-43.  adidas has thus failed to establish "significant advertising expenditures" for its claimed trade dress or that its promotional activities "had an impact on consumers sufficient to establish secondary meaning."  *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1154-44 (C.D. Cal. 2009).

adidas' reliance on press mentions of the "Stan Smith" is also unavailing.  Media articles themselves are inadmissible hearsay.  *Larez v. City of L.A.*, 946 F.2d 630, 642-43 (9th Cir. 1991). Mr. Beaty also testified that he could not "vouch" for the accuracy of the articles that are attached to his declaration and on which adidas relies.  Raphael Decl., Exs. 4a-4b (Beaty Dep.) at 96:25-97:24.  Even more importantly, "[e]vidence which merely shows that a product is popular is not probative evidence of secondary meaning in the trademark for that product."  MCCARTHY § 15:47; *Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477, 483 (S.D.N.Y. 1983).  For popularity to be relevant, "causation between the [trade dress] and the popularity must be proved." MCCARTHY § 15:47.  adidas has made no such showing.

Finally, adidas' attempt to show secondary meaning based on alleged "intentional copying" is unfounded.  Mot. at 23-24.  The Skechers shoe at issue—the SKECHERS® Onix—

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

prominently displays Skechers' own trademarks, refuting any inference that the asserted trade dress was imitated "in order to capitalize on its secondary meaning"—*i.e.*, to cause consumers to mistakenly believe the products were actually from adidas. *Spark Indus., LLC v. Kretek Int'l, Inc.*, No. CV 14-5726-GW ASx, 2014 WL 4365736, at *11, *14 (C.D. Cal. Aug. 28, 2014); *see also Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994) (clearly erroneous to infer secondary meaning from defendant's copying of plaintiff's product given defendant's "conspicuous use of its own trademarks"). This inference is especially inappropriate in product-design trade dress cases because competitors can lawfully copy product features "that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844-45 (9th Cir. 1987). Where, as here, the asserted trade dress "has no secondary meaning," any alleged copying "does not provide independent evidence of secondary meaning." *Cont'l Lab.*, 114 F. Supp. 2d at 1008-13.

> **B.** **Adidas' "Stan Smith" Claims Fail Because Its Asserted Trade Dress Is Functional.**

adidas' "Stan Smith" claims also stumble right out of the gate for a second reason— adidas has not established that the asserted trade dress is nonfunctional. The "physical details and design of a product" are protectable as trade dress only if they are nonfunctional, and unregistered trade dress (like the asserted "Stan Smith" trade dress) is presumed by statute to be functional. *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 683 (9th Cir. 2012) (citing 15 U.S.C. § 1125(a)(3)).

There are two types of functionality adidas is required to negate: utilitarian functionality and aesthetic functionality. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001). Trade dress has utilitarian functionality "when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *Id.* Trade dress is aesthetically functional if limiting Skechers' use of the trade dress would impose a "significant

PAGE 22 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

non-reputation-related competitive disadvantage" on Skechers. *See Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006).

adidas makes no attempt to meet its "heavy burden" to establish nonfunctionality or overcome the presumption of functionality, and its motion should be denied on this ground alone. *Farmgirl Flowers, Inc. v. Bloom That, Inc.*, No. 14-CV-05657-LHK, 2015 WL 1939424, at **6-8 (N.D. Cal. Apr. 28, 2015); *Leatherman Tool Grp. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012-14 (9th Cir. 1999).

In all events, adidas cannot meet its burden on the utilitarian functionality test, which requires that the entire claimed trade dress "must be nonfunctional." *Leatherman*, 199 F.3d at 1012. A product feature "need only have *some* utilitarian advantage to be considered functional." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1007 (9th Cir. 1998) (listing factors for functionality, including whether the design yields a utilitarian advantage and whether alternative designs are available). Here, the main elements of the asserted "Stan Smith" trade dress are functional:

**White upper and outsole.** Tennis shoes have historically featured white uppers and outsoles because tennis competitions traditionally require players to wear white, leaving competitors with no alternative designs to a predominantly white upper and outsole.[7]

**Rows of perforations**. Perforations on the side provide the utilitarian advantages of ventilation and flexibility, advantages that are touted in patents obtained by adidas' founder, Adolf Dassler. Raphael Decl., Ex. 45 (U.S. Patent No. 4,100,685) at 1:26-32 (noting that "it has long been customary to provide one or more venting orifices on the upper at the instep, and to perforate the vamp, in order to permit access of air to the foot"); Ex. 46 (U.S. Patent No. 5,371,957) at 1:62-2:3 (disclosing an athletic shoe with an upper that is perforated for ventilation and flexibility); *see TrafFix*, 532 U.S. at 29-30.

---

[7] For example, for nearly a century, Wimbledon has required competitors to be dressed in "suitable tennis attire that is almost entirely white." Raphael Decl., Ex. 44.

PAGE 23 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION



**Raised heel patch.** A raised heel patch provides support and comfort, and has been described in both advertising and utility patents as providing Achilles tendon support:



Raphael Decl., Ex. 47 (U.S. Patent No. 6,412,195) at Fig. 6; 4:50-52.

The utilitarian nature of these claimed trade dress elements explains their prevalence in third-party shoes, as shown in Tables 6-9 above. Competitors such as Asics, K-Swiss, New

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

Balance, and Puma sell shoes with perforations, stitching, and raised heel patches not to imply an association with adidas, but because they provide simple utilitarian advantages.

The asserted trade dress is also aesthetically functional, providing "an independent bar to trade dress protection." *Farmgirl Flowers*, 2015 WL 1939424, at *7. The claimed "Stan Smith" elements reflect utilitarian improvements made to tennis shoes in the 1960s and 1970s. Kartalis Decl. ¶ 12. Although the athletic shoes of that era are no longer state of the art, there is still a market for such "retro" shoes because consumers appreciate their aesthetic qualities and associate their design elements with the 1960s and 1970s (not with adidas). *Id.* Giving adidas a monopoly on these elements would place Skechers at a significant non-reputation-related disadvantage in serving the market for such "retro"-looking shoes.

### C. Adidas' Trademark Infringement Claims Fail Because There Is No Likelihood of Confusion.

For all three accused Skechers products, adidas is unlikely to establish likelihood of confusion under the factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). To prove likelihood of confusion, adidas must show that confusion is ***probable***, not merely possible. *KP Permanent Make-Up, Inc. v. Lasting Impressions I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005). Here, consideration of the *Sleekcraft* factors weighs strongly against a likelihood of confusion.

#### 1. The adidas marks are weak.

adidas' "Stan Smith" trade dress, three-stripe trademark, and "Supernova" trademark are weak at best and should be afforded narrow protection. As discussed above, even if the "Stan Smith" trade dress had acquired secondary meaning (it has not) and was therefore protectable, it exists in a crowded field of similar-looking classic sneakers that incorporate its composite elements. *See supra* Tables 6-9. In such a "crowded field," "each member of the crowd is

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

relatively 'weak' in its ability to prevent use by others in the crowd." *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988).[8]

adidas' three-stripe mark likewise exists in a crowded field of similar marks with side-panel striping and is thus weak, as shown in Table 10 below.



**Table 10:  Third-Party Shoes with Side-Panel Stripes**

*See* Raphael Decl., Exs. 49-64.

---

[8] Ms. Butler's secondary meaning survey further demonstrates the weakness of the asserted trade dress.  Butler Secondary Meaning Survey ¶¶ 39-40, 43.

PAGE 26 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

As noted in another case involving athletic shoe designs, "it is the common practice among the manufacturers of athletic shoes to place various [s]tripe and bar designs on the sides of their respective shoes," and this practice leaves shoe companies "with marks that are extremely weak and certainly entitled to only a very narrow and limited scope of protection." *In re Lucky Co.*, 209 U.S.P.Q. 422, 423 (T.T.A.B. 1980).

adidas' attempt to rely on the "incontestable" status of its trademark registrations for the three-stripe and "Supernova" marks is unavailing (and misdirection), as incontestability bears only on the validity of adidas' federal trademark ***registrations***, not on *Sleekcraft*'s "strength" factor. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 & n.3 (9th Cir. 2002). An "incontestable" mark can nonetheless be weak and subject to relatively narrow protection where, as here, it exists in a crowded field of similar marks. *Miss World*, 856 F.2d at 1449.

Finally, adidas' "Supernova" trademark is weak for the additional reasons that the mark appears nowhere on adidas' current footwear sold under the mark (Raphael Decl., Ex. 65) and adidas has only invested "hundreds of thousands of dollars" in promotion of the mark and sold only "millions of dollars" of "Supernova" products over a 20-year period (Mot. at 29). *See, e.g.*, *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 450-51 (S.D.N.Y. 2008) ($400,000 spent over five years advertising products insufficient to establish strength of mark).

### 2. The adidas and accused Skechers marks and product designs are not similar.

Similarity is not determined based on an abstract comparison of marks, but must focus on how the marks "are encountered in the marketplace, taking into account the normal circumstances surrounding purchase of the type of goods they represent." *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 994 (C.D. Cal. 2002). This rule applies even to identical marks. *Id.* at 995; *see also Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) (identical marks dissimilar where the pens on which they were used, their packaging, and their advertising were dissimilar).

PAGE 27 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

First, Skechers' Onix shoe is dissimilar to the adidas "Stan Smith" sneaker:



**Table 11:  adidas "Stan Smith" and SKECHERS® Onix**

| adidas "Stan Smith" | SKECHERS® Onix |
|---|---|

Raphael Decl., Ex. 66; Butler Onix Survey at 12.

Like other shoes in the crowded "retro" sneaker market, the Onix shoe features perforations, but these perforations differ substantially from those on the "Stan Smith."   The

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

Onix perforations are arranged in five, not three, rows and extend in the opposite direction of the perforations on the "Stan Smith." Additionally, the shade of green employed on the heel patches of the "Stan Smith" differs from the green on the Onix. The unmistakable brand names and logos (*e.g.*, "adidas" and "Stan Smith" vs. "Skechers" and the "S" symbol) further differentiate these products from each other.

Second, the accused SKECHERS® RELAXED FIT® Cross Court TR side-panel design is strikingly different from adidas' three-stripe trademark:

**Table 12:  adidas Three-Stripe Mark and SKECHERS® RELAXED FIT® Cross Court TR**

| adidas Three-Stripe Trademark | Cross Court TR Side-Panel Design |
|---|---|



Raphael Decl., Ex. 49; Butler Decl., Ex. 3 at 12; Kartalis Decl. ¶ 16. adidas' three-stripe mark consists of three parallel stripes of equal and uniform thickness with consistent spacing between the stripes. By contrast, the allegedly infringing design on the SKECHERS® RELAXED FIT® Cross Court TR has three lines of unequal and varying thickness that combine halfway down the shoe to form a letter "E." A separate, singular path combines the fabric of the "E" to the sole of the shoe. The edges of the lines of the Cross Court TR side panel are also rounded, in contrast to

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

the sharp parallelogram corners of adidas' three-stripe mark.  *See* Kartalis Decl. ¶ 16.  Again, the unmistakable brand names and logos further differentiate the adidas and Skechers products.

Third, although Skechers used the term "supernova" as a product style name for its women's RELAXED FIT® shoes, the term appears nowhere on the Skechers' shoes at issue. *Id.* ¶ 19.  Skechers merely used the term descriptively to refer to the color scheme of the shoes, which was patterned after the vibrant imagery of a celestial supernova.  *Id.*  adidas likewise does not use its "Supernova" mark on its shoes sold under that brand.  *See* Raphael Decl., Ex. 65. Thus, when the parties' shoes "are encountered in the marketplace," *Glow*, 252 F. Supp. 2d at 994, no similarity exists between the parties' respective uses of the term "supernova":

| Table 13:  adidas "Supernova" and SKECHERS® RELAXED FIT® (Supernova Style) | |
| --- | --- |
| adidas "Supernova" Sequence Boost 8 | SKECHERS® RELAXED FIT® (Supernova Style) |



*See* Raphael Decl., Ex. 67; Kartalis Decl. ¶ 19.

Further undercutting adidas' argument of confusing similarity is the pervasive and prominent appearance of the SKECHERS® trademarks and logos on each of the challenged

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

shoes, and their labeling and packaging. *See* Kartalis Decl. ¶¶ 13-14, 17-21. This branding is plainly visible to others when the shoes are worn or sold, and eliminates any possibility of confusion. *Id.* ¶¶ 23-24; *see Walter v. Mattel, Inc.*, 31 F. Supp. 2d 751, 760 (C.D. Cal. 1998); *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1163-64 (9th Cir. 2009).

Such prominent branding has been recognized as eliminating not only point-of-sale confusion but also any possible post-sale confusion. As the court explained in *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117 (Fed. Cir. 1993):

> We conclude that the conspicuous and permanent placement of the trademarks of L.A. Gear as well as the copyist, and the sophistication of purchasers of fashion athletic shoes, clearly outweigh the similarity in the shoe design, insofar as consumer confusion as to source is avoided. . . .

*Id.* at 1134; *see also Reebok Int'l Ltd. v. Alon*, 5 U.S.P.Q. 2d 1830, 1831-32 (C.D. Cal. 1987); *Leatherman*, 199 F.3d at 1014.

The distinctive labeling and packaging of the challenged Skechers shoes, which are prominently and conspicuously labeled with Skechers' trademarks and logos, further foreclose any possibility—***much less a probable likelihood***—of confusion. *See* Kartalis Decl. ¶¶ 14, 18, 21.

 




### 3. There is no actual confusion.

Skechers' expert, Ms. Butler, conducted surveys to test for confusion based on the SKECHERS® Onix and SKECHERS® RELAXED FIT® Cross Court TR shoes, and found that no such confusion was likely. Butler Onix Survey ¶ 44, Butler Cross Court Survey ¶ 44. In each survey, Ms. Butler presented the shoes as they would be seen when displayed online or when evaluating them in a store. Butler Onix Survey at 12, Butler Cross Court Survey at 12.

### SKECHERS® Onix Test Images



PAGE 32 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

**SKECHERS® RELAXED FIT® Cross Court TR Test Images**



Ms. Butler's surveys also included control sneakers that removed or modified the allegedly infringing trade dress or trademark, in order to eliminate responses based on irrelevant features of the shoes, such as those based on a common color or style. Butler Onix Survey at 12-14, Butler Cross Court Survey at 12-14.



| Table 14: Butler Confusion Survey Stimuli |
| :---: |
| **SKECHERS® Onix Survey Stimuli (Examples Images)** |

| Test Stimulus | Control Stimulus |
| :---: | :---: |
| | |

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

| Table 14: Butler Confusion Survey Stimuli |
|---|
| **SKECHERS® RELAXED FIT® Cross Court TR Survey Stimuli** |



**Test Stimulus**



**Control Stimulus**

In Ms. Butler's Onix survey, only a net 6.5% of respondents believed the Onix shoe was made or put out by, affiliated with, or sponsored by adidas. Butler Onix Survey ¶ 43.[9] In her RELAXED FIT® Cross Court TR survey, the net confusion level was 1%. Butler Cross Court Survey ¶ 43.[10] In both surveys, the vast majority of respondents correctly identified the shoes as Skechers products. Butler Onix Survey ¶ 37, Butler Cross Court Survey ¶ 37. Ms. Butler's surveys—both of which show net confusion levels well below 10%—demonstrate that no confusion is likely. *See* McCarthy § 32.189; *Skechers U.S.A., Inc. v. Vans, Inc.*, No. CV 07-01703, 2007 WL 4181677, at *9 (C.D. Cal. Nov. 20, 2007) (survey showing 5.4% confusion level insufficient to establish a likelihood of confusion).

adidas, meanwhile, admitted in its preliminary injunction motion that it had no evidence of actual confusion for any of the accused Skechers shoes. Mot. at 31. Then, three weeks after filing that motion, it filed a hastily contrived survey by Hal Poret concerning the SKECHERS® Onix shoe on purported "post-sale confusion" (*see* ECF No. 38-1)—a form of consumer confusion never alleged in adidas' Complaint. Notably, adidas has still not presented any evidence of actual confusion as to the SKECHERS® RELAXED FIT® Cross Court TR or Skechers' use of the term "supernova."

As for the Onix, Mr. Poret's survey purports to find a net 20.5% level of post-sale confusion, which he derives from claimed confusion levels of 27% and 6.5% in a test group and

---

[9] 8% gross confusion in the test group - 1.5% in the control group = 6.5% net confusion. *Id.*
[10] 2% gross confusion in the test group - 1% in the control group = 1% net confusion. *Id.*

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

a control group, respectively (27% - 6.5% = 20.5% net). ECF No. 38-1 at 32. However, the test image in his survey was a single side-view of the Onix, while the control image was a radically different-looking shoe style (*i.e.*, a running or cross-training style). *Id.* at 8.



| Table 15: Poret Confusion Survey Stimuli | |
| --- | --- |
| Test Stimulus | Control Stimulus |

There is no shortage of decisions discrediting Mr. Poret's survey opinions. *See, e.g.*, *Imig, Inc. v. Electrolux Home Care Prods., Ltd.*, No. CV 05-0529(JO), 2008 WL 905898, at *10 (E.D.N.Y. Mar. 31, 2008). Mr. Poret's survey in this case is similarly flawed and unreliable, for at least the following reasons.

First, Mr. Poret's survey gave respondents only a single side-view of the Onix shoe at issue, which obscured the otherwise visible SKECHERS® trademark on the tongue, and gave respondents no opportunity to see the SKECHERS® and "S" symbol prominently displayed on the heel patch or elsewhere on the shoe. Raphael Decl., Ex. 68 (Poret Dep.) at 100:15-102:2, 105:11-106:14, 108:1-110:3, 111:2-22. The (not accidental) decision to present only this one view artificially boosted Mr. Poret's claimed confusion rate, as "the purported rates of confusion would likely have been dramatically lower" had respondents been shown other views of the Onix, like the one below. Butler Decl., Ex. 4 ("Butler Rebuttal Report") ¶¶ 26-27. Indeed, Mr. Poret admitted he did not know how his confusion rate would have differed had he shown other views of the Onix. Raphael Decl., Ex. 68 (Poret Dep.) at 105:24-106:14.

PAGE 35 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION



Mr. Poret's use of an image that so obviously prevented respondents from seeing the prominent Skechers branding and logos on the Onix alone renders his survey unreliable. *Vans*, 2007 WL 4181677, at **8-9 (discounting post-sale survey with a picture that obscured identifying labels).

Second and relatedly, Mr. Poret's decision to present only a single side-view of the Onix in his survey violates the requirement that a survey must "approximate the manner in which consumers encounter[] the parties' products" in the real world. *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 235-41 (S.D.N.Y. 2010). As Mr. Poret admitted at deposition, "there are lots of different scenarios in which [shoes] can be encountered after sale," such as from a rear view where Skechers' marks and logos are plainly visible. Raphael Decl., Ex. 68 (Poret Dep.) at 14:24-16:22, 99:23-100:10. Mr. Poret tested none of these scenarios, and admitted further that he had conducted no research to confirm that the specific view in his survey was how the Onix would typically be seen in real-world situations. *Id.* at 97:24-99:3. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007) ("A survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone.").

Third, Mr. Poret's survey was effectively a post-sale "memory test," in which respondents were given only a brief view of the shoe image before it was taken away and they

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

were asked questions. Butler Rebuttal Report ¶ 29. Mr. Poret offers no explanation for why his presentation of the Onix was an appropriate representation of the post-sale environment. *Id*. To the contrary, adidas' own survey expert, Dr. Gerald Ford, testified before this Court in a prior case brought by adidas, the *adidas v. Payless* trademark litigation, that stimulus images should be left in view while respondents are answering survey questions so that they have "every opportunity to distinguish the [accused] shoe from the adidas shoe." Raphael Decl., Ex. 69 ¶ 97. Mr. Poret deviated from this requirement of Dr. Ford's methodology, with no apparent justification. Raphael Decl., Ex. 68 (Poret Dep.) at 67:9-12, 173:19-174:15.

Finally, Mr. Poret's survey used a control that was critically flawed. As an initial matter, his control shoe was a completely different style of shoe (*i.e.*, a running or cross-training style) from the "tennis-style" of the test Onix sneaker. Butler Rebuttal Report ¶¶ 11-24. His control also lacked the flat outsole of the test shoe. *Id*. Because of these critical flaws in his control, his survey did not measure the extent to which respondents mentioned adidas because they generally associate adidas with tennis-style sneakers or flat outsoles, rather than because of the specific combination of elements that adidas claims infringes its trade dress. *Id*. ¶ 11. The impact of Mr. Poret's flawed control on his ultimate results inevitably lowered the rate at which respondents mentioned adidas in the control because the sneaker style shown was so radically different from the Onix. Butler Rebuttal Report ¶ 22. This, in turn, overestimated the net level of confusion— rendering his survey even more unreliable. *Id*.; *see Malletier*, 525 F. Supp. 2d at 596.

In short, on actual confusion, adidas offers nothing more than a belated, flawed survey on the SKECHERS® Onix (and on a theory of confusion nowhere asserted in its Complaint), and nothing whatsoever on its other two claims. Skechers, on the other hand, has submitted survey evidence that is far more probative of how the accused Skechers products are likely to be seen in the real world (*i.e.*, online and in stores), and which show no confusion is likely. Given that the accused Skechers shoes have been on the market for three months to a year (Kartalis Decl. ¶¶ 11, 15, 19), adidas' failure to adduce any meaningful evidence of confusion weighs against a finding

PAGE 37 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

of likelihood of confusion. *Playboy Enters., Inc. v. Netscape Commc'n Corp.*, 55 F. Supp. 2d 1070, 1083 (C.D. Cal. 1999).

**4.      Skechers' serial branding negates any inference of an intent to deceive.**

The relevant inquiry for the "intent" factor is whether Skechers intended to deceive consumers into thinking that the source of the disputed products was adidas. *See Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 791 n.2 (9th Cir. 1981). adidas' assertions that Skechers was aware of the "Stan Smith" and three-stripe trademark fall short of meeting this standard (Mot. at 3, 30), as "knowledge or awareness of the senior user's mark is not the same as an intent to confuse customers." MCCARTHY § 23:115.[11]

To the contrary, Skechers' name and trademarks are among the company's most valuable assets, and Skechers has no intent or desire to confuse customers as to the source of its shoes. Kartalis Decl. ¶ 22. Indeed, the accused shoes are prominently branded with Skechers' trademarks and logos, including on the tongue, insole, outsole, and heel patch, and on their labeling and packaging. *Id.* ¶¶ 13-14, 17-21. Under these circumstances, no intent to deceive can be found. *See, e.g., Aromatique*, 28 F.3d at 871; *Cont'l Lab.*, 114 F. Supp. 2d at 1010 n.14.

Skechers' use of the search terms "adidas stan smith" and "adidas original" in the backend-only metadata of the Skechers website does not, as adidas erroneously asserts, show bad faith. Mot. at 3. To input these search terms, consumers would necessarily have to be ***on and actively searching the Skechers website***—a scenario in which they could not possibly be confused about the source of the accused SKECHERS® Onix shoes, as evidenced by adidas' own exhibit shown below.

---

[11] adidas does not allege that Skechers had pre-suit knowledge of adidas' claimed rights in the mark "Supernova," and thus concedes no bad faith on Skechers' part with respect to that mark.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200



ECF No. 1-24 at 1.  Indeed, the Ninth Circuit has flatly rejected a finding of bad faith intent in such instances.  *See Multi Time Mach., Inc. v. Amazon.com, Inc.*, No. 13-55575, 2015 WL 6161600, at *7 (9th Cir. Oct. 21, 2015).  Where, as here, a website produces search results that are "clearly labeled as to the type of product and brand," no reasonable consumer would be confused, and there exists no intent to deceive consumers. *Id.* at **7-8.

Similarly, no intent can be inferred from Skechers' previous interactions with adidas. None of the parties' prior disputes involved any of the Skechers products or designs accused in this case.  Paccione Decl. ¶ 6; ECF No. 9-5.  And all were resolved by agreements that included express denials of adidas' allegations and/or acknowledgments that Skechers was not admitting infringement of adidas' intellectual property rights.  Paccione Decl. ¶¶ 8-9; ECF No. 9-5 at 1. Indeed, if any party has exhibited bad faith here, it is adidas—by ambushing Skechers with this lawsuit and preliminary injunction motion without any pre-suit notice and without seeking to

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

resolve its issues with Skechers informally under the "cooling-off" provisions of the parties' 2008-2013 letter agreements. Paccione Decl. ¶¶ 8-10.[12]

### 5. Footwear customers exercise a high degree of care.

Footwear is an intensely personal item that reflects the style and personality of the wearer. Kartalis Decl. ¶ 24. Customers typically take their time in deciding whether to make a particular purchase—finding the right style and size, making a decision on appearance, and then deciding to buy. *Id.* During that process, a person has substantial and repeated exposure to the Skechers brand name and logo on the shoes themselves as well as their packaging. *Id.*

Indeed, in *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117 (Fed. Cir. 1993), the Federal Circuit held that the district court erred in viewing purchasers of footwear as unsophisticated in their purchases. *Id.* at 1134 ("purchasers of fashion athletic shoes are likely to be well aware of the sources of such shoes"). In its public financial filings, adidas has also admitted the sophistication of its customers. Raphael Decl., Ex. 70 at 32 (2013 adidas Annual Report) ("This is a target consumer group we have been steadily building a strong commitment to, as their flair and ***sophistication as curators of product*** match the essence of what Originals is all about.") (emphasis added).

### 6. Proximity of goods and likelihood of expansion favor Skechers.

Skechers' shoes and adidas' shoes are distinguishable in terms of the segment of the marketplace that is primarily attracted to each company's products. Skechers is primarily a lifestyle brand. Kartalis Decl. ¶ 3. adidas, on the other hand, caters to the athletic shoe market. Raphael Decl., Ex. 70 at 79 (2013 adidas Annual Report); Ex. 71 at 55 (2014 adidas Annual Report). Skechers and adidas target markets also differ: Skechers' shoes are primarily marketed to women and men ages 35 to 54 (Kartalis Decl. ¶ 3), while adidas' "Stan Smith" shoes have

---

[12] Indeed, adidas' decision to commence this action is apparently not driven by concern for its trade dress, but by a desire to retaliate against Skechers for suing an adidas subsidiary, Reebok, for patent infringement last year. Declaration of Mark Samuels (ECF No. 21) at 2.

PAGE 40 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

been aimed at "16- to 24-year-old consumer[s]." Raphael Decl., Ex. 70 at 80 (2013 Annual Report).

Even though Skechers and adidas both sell footwear, where, as here, the products are "clearly labeled" and "consumers exercise a high degree of care," this similarity of goods does not favor a finding of likelihood of confusion. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). To the contrary, under such circumstances, consumers are merely "confronted with choices among similar products" and are not "being misled." *Id.* Similarly, even if, as adidas asserts, the parties were "direct competitors" (Mot. at 32), this renders the "likelihood of expansion" factor "unimportant." *Id.* at 1153. Thus, these factors also weigh against a likelihood of confusion or are, at best, neutral.

### 7. Adidas and Skechers use different marketing channels.

adidas' and Skechers' marketing channels also differ. The asserted adidas shoes are marketed in channels intended to reach athletes and young, fashion-driven consumers, on the one hand. Raphael Decl., Ex. 70 at 77, 79-80 (2013 Annual Report). Skechers' shoes, in contrast, are marketed primarily as a lifestyle brand, and sold in its network of company-owned Skechers retail stores, as well as third-party stores, where they are mainly surrounded by the "Skechers" name and Skechers' trademarks and logos. Kartalis Decl. ¶ 4.

adidas offers no credible evidence that the accused Skechers shoes have ever appeared in the same stores as, or on the same shelves with, any of the asserted adidas footwear. Even if the products were sold in the same stores, in-store signage and Skechers' serial branding of its shoes and product packaging would eliminate any risk of confusion. *See L.A. Gear*, 988 F.2d at 1134.

### D. Skechers Is Likely To Succeed On Its Descriptive Fair Use Defense To Adidas' "Supernova" Claim.

To succeed on its motion, adidas must also demonstrate a likelihood of prevailing against affirmative defenses raised by Skechers. *Dr. Seuss Enters. v. Penguin Book USA, Inc.*, 924 F. Supp. 1559, 1562 (S.D. Cal. 1996). However, Skechers' use of the term "supernova" to describe

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

the color scheme of certain of its RELAXED FIT® shoes is a textbook example of descriptive fair use.

To establish a descriptive fair use defense, Skechers need only show that it used the phrase descriptively, not as a trademark, and in good faith. *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002); 15 U.S.C. § 1115(b)(4). This test is easily met here. Skechers used the term "supernova" descriptively and in good faith as a product style label to describe the shoes at issue, which are adorned with a cosmic color scheme resembling the colors of a supernova, as shown below.

| Table 16: Supernova and SKECHERS RELAXED FIT® (Supernova Style) | |
| --- | --- |
| **N132D supernova remnant** | **SKECHERS® RELAXED FIT®**<br>**(Supernova Style)** |



Raphael Decl., Ex. 72; Kartalis Decl. ¶ 19. adidas' motion does not assert any bad faith on Skechers' part in using the term "supernova," nor could it.

Skechers' descriptive fair use defense of its challenged use of the term "supernova" provides another ground for denying adidas' motion. *See Marcal Paper Mills v. Scott Paper Co.*, 290 F. Supp. 43, 52 (D.N.J. 1968); *W. Publ'g Co. v. Rose Art Indus.*, 910 F.2d 57, 63 (2d Cir. 1990).

PAGE 42 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

E.  **Adidas' Trademark Dilution Claims Fail Because Its Marks Are Not Famous And There Is No Likelihood Of Dilution.**

As with its likelihood of confusion claims, adidas is unlikely to prevail on its claims for dilution—an "unusual and extraordinary" remedy that "should be proved only by an unambiguous case resting on a solid evidentiary basis." MCCARTHY § 24:67.  To establish dilution, adidas must prove, *inter alia*: (1) that its "Stan Smith" trade dress and three-stripe mark are famous; and (2) that Skechers' conduct is likely to dilute adidas' "Stan Smith" trade dress and three-stripe mark.  15 U.S.C. § 1125(c).  Here, adidas fails to establish any of these elements.

1.  **Adidas' "Stan Smith" trade dress and three-stripe mark are not famous.**

"It is well-established that dilution fame is difficult to prove." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) (COACH for handbags not famous).  Fame "is a rigorous standard" and "extends protection only to highly distinctive marks that are well-known throughout the country." *Lyden v. adidas Am., Inc*., No. 3:14-CV-01586-MO, 2015 WL 566564, at *4 (D. Or. Feb. 10, 2015).  Fame is assessed under four factors: (i) the duration, extent, and geographic reach of advertising and publicity of the mark; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; (iv) whether the mark was registered on the principal register.  15 U.S.C. § 1125(c)(2)(A).  The fame of each asserted mark must be assessed on its own merits.  Under the relevant standards, none are famous.

As to the "Stan Smith" trade dress:

**Advertising/Publicity Reach.**  adidas' use and promotion of the "Stan Smith" trade dress has **not** been continuous; adidas halted production of the "Stan Smith" for at least two years.  ECF No. 8-1 at 3.  Moreover, Mr. Beaty admitted his assertions that adidas had spent "tens of millions of dollars" promoting its "Stan Smith" line were based on "assumption[s]" and "guesstimations."  Raphael Decl., Exs. 4a-4b (Beaty Dep.) at 108:6-21.

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

**Sales.**  adidas' claim of "hundreds of millions" in U.S. sales of the "Stan Smith" trade dress is also baseless.  Mr. Beaty only claimed *tens* of millions of dollars of "Stan Smith" sales *worldwide*, Beaty Decl. ¶¶ 8, 11, and then admitted at deposition that this statement was based on a "sound bite" adopted from another adidas employee without any evidence to support the claim.  Raphael Decl., Exs. 4a-4b (Beaty Dep.) at 98:24-100:4.  And given adidas' sale of myriad styles of "Stan Smith" shoes—including dozens featuring few, if any, of the elements of the claimed "Stan Smith" trade dress—the "sound bite" sales figure lacks any direct correlation to the "Stan Smith" trade dress.  *See supra* Table 5.  Indeed, at deposition, Mr. Beaty could not say how many pairs of "Stan Smith" shoes with the claimed trade dress were sold in the United States in any given year.  Raphael Decl. Exs. 4a-4b (Beaty Dep.) at 100:5-8, 101:1-4, 101:8-102:9.

**Recognition.**  Proof of actual recognition of a trademark is typically shown through surveys demonstrating at least "75% of the general consuming public of the United States" recognizes the asserted mark as a designation of source.  MCCARTHY § 24:106.  Here, adidas provides no such evidence, while Skechers' survey evidences only a net 4% one-brand association of the "Stan Smith" trade dress—far from the requisite threshold for establishing that the claimed trade dress is a "household name."  *See, e.g.*, *Coach*, 668 F.3d at 1373.  In place of survey evidence, adidas relies solely on a handful of articles attached as exhibits to Mr. Beaty's declaration, primarily in niche publications such as "Footwear News," "i-D Magazine," and "Complex."  But popularity in niche markets is insufficient under current anti-dilution law.  MCCARTHY § 24:105.  Further, as discussed above, these articles constitute inadmissible hearsay—even Mr. Beaty refused to vouch for their accuracy.  Raphael Decl. Exs. 4a-4b (Beaty Dep.) at 96:25-97:24.

And as to the three-stripe mark:

**Advertising/Publicity Reach.**  adidas's claimed advertising expenditures of "$38 million annually" is not limited to spending aimed at U.S. consumers, the relevant consumer base.

PAGE 44 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Particularly for a Germany-based company actively seeking to attract consumers outside of the United States, such an overbroad figure cannot support fame in the United States. Likewise, adidas' attempts to prove fame in the United States through a hearsay article reporting adidas' growth within China and other foreign markets is misguided (and misleading). ECF No. 7-6 at 5. adidas also fails to produce any evidence of advertising focused on creating a consumer association between the three-stripe mark and adidas: its own cited article regarding adidas' advertising push in 2011, for instance, notes that the "three stripes make only fleeting appearances in the 60 second spot." *Id*. at 9. Without substantial additional evidence, the Court cannot presume nationwide consumer association with this mark. *Reebok Int'l, Ltd. v. K-Mart Corp.*, 849 F. Supp. 252, 265 (S.D.N.Y.), *vacated without opinion*, 33 U.S.P.Q.2d 1863 (S.D.N.Y. 1994).

**Recognition.** adidas' contention that "this Court previously has held the Three-Stripe Mark to be famous" should be rejected. Mot. at 33. Inferring fame from rulings in prior actions in which Skechers was not a party would violate the rule against nonparty preclusion and the "deep-rooted historic tradition that everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008). Moreover, seven-year-old rulings cannot establish current fame (*i.e.*, fame during the period of Skechers' sale of the accused products). Indeed, one of these rulings exemplifies the fleeting nature of fame, noting that the strength of the three-stripe mark ebbed from "the late 1970s and on into the 1990s as adidas's position as market leader declined to a 3% market share in 1992." *adidas Am., Inc. v. Kmart Corp.*, No. CV-05-120-ST, 2006 WL 2044857, at *12 (D. Or. June 15, 2006).

## 2. Adidas has not established likelihood of dilution.

Over and above adidas' failure to prove fame of its trade dress or three-stripe mark, adidas also presents no evidence that Skechers' conduct is likely to cause dilution. As discussed below, none of the six factors in 15 U.S.C. § 1125(c)(2)(B) suggests a likelihood of dilution—to the contrary, the evidence undermines any such claim.

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

First, the marks are not similar enough to "impair[] the distinctiveness" of adidas' marks. 15 U.S.C. § 1125(c)(2)(B). As discussed *supra* in Section I.C.2, the Onix is not identical to adidas' claimed "Stan Smith" trade dress and the challenged design on the RELAXED FIT® Cross Court TR is dissimilar to the three-stripe mark. adidas has presented no evidence of consumer perception substantiating its claim that the RELAXED FIT® Cross Court TR is viewed by consumers as having a high degree of similarity—particularly within a crowded field.

The second and third factors—distinctiveness and exclusivity—also confirm no likelihood of dilution. "A mark that is merely one of several identical or very similar marks is already 'diluted' in fact." McCarthy § 24:119. Here, the claimed "Stan Smith" trade dress and the three-stripe mark exist in a field crowded with other sneaker brands using these same or highly similar design elements. *See supra* Tables 6-9, 11; *see also Reebok v. K-Mart*, 849 F. Supp. at 262. "[A] mark that is hemmed in on all sides by similar marks on similar goods or services cannot be very 'distinctive' since it is merely one of a crowd of look-alike marks." McCarthy § 24:118.

adidas has produced no evidence that the fourth factor—degree of recognition—supports its claim of dilution. As discussed above, adidas fails to establish fame.

The fifth factor—intent to create an association—likewise favors Skechers. Skechers' use of the challenged design on the RELAXED FIT® Cross Court TR is merely another instance of one of the limited design elements available for sneakers in an already crowded field. adidas has provided no evidence that the design was intended to evoke an association with adidas' three-stripe mark. And Ninth Circuit precedent flatly rejects adidas' attempts to establish bad faith based on a non-deceptive search result on Skechers' website. *Multi Time*, 2015 WL 6161600, at *7.

The final dilution factor—actual association—is completely absent; adidas has simply alleged, without any supporting evidence, that consumers perceive Skechers' products as "essentially the same" as adidas' products. Mot. at 33-34. It is pure *ipse dixit* and should be

PAGE 46 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

rejected out of hand. And adidas' survey purporting to show a 20.5% post-sale confusion level for the Onix relies on indefensible, unreliable methods, yet still fails to establish a meaningful level of association based on any alleged similarities.

## II.    <u>ADIDAS HAS FAILED TO ESTABLISH IRREPARABLE HARM</u>

Even if adidas could show a likelihood of prevailing on the merits of its claims (which it cannot), its motion would still fail because it has utterly failed to show any actual irreparable harm "grounded in [] evidence"—as the Ninth Circuit now requires for obtaining a preliminary injunction in trademark cases. *Herb Reed*, 736 F.3d at 1249-51. In *Herb Reed*, the Ninth Circuit expressly overruled prior case law allowing courts to presume irreparable harm from a showing of trademark infringement, noting that this was inconsistent with the Supreme Court's holdings in *eBay* and *Winter*. *Id*. at 1249-50. Under *Herb Reed*, irreparable harm may not be presumed or "grounded in platitudes," and speculative future harm is insufficient—adidas must produce *evidence* of likely, intangible harm. *Id*.

Tellingly, adidas ignores *Herb Reed* entirely in its motion—adidas cites only district court cases predating *Herb Reed* (in some cases, by decades) and presents no evidence whatsoever of cognizable harm, irreparable or otherwise. Mot. at 34-35. adidas is, in effect, inviting the Court "to reinsert the now-rejected presumption of irreparable harm"—in direct contradiction to binding Ninth Circuit precedent. *Herb Reed*, 736 F.3d at 1250. To do so would be error.

Because adidas has failed to present evidence that demonstrates irreparable harm, adidas' motion should be denied on this ground alone. *Idylwilde, Inc. v. Umpqua Feather Merchants, LLC*, No. 3:13-CV-02009-HZ, 2014 WL 199201, at *12 (D. Or. Jan. 16, 2014) ("Plaintiffs' failure to proffer sufficient evidence showing a likelihood of irreparable harm alone provides a sufficient basis on which to deny their motion for a preliminary injunction."); *see also Sleash, LLC v. One Pet Planet, LLC*, No. 3:14-CV-00863-SI, 2014 WL 4059163, at *7 (D. Or. Aug. 15, 2014); *Ovitsky v. Oregon*, No. 3:12–CV–02250–AA, 2013 WL 5253162, at *3 (D. Or. Sept. 16,

PAGE 47 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

2013); *Active Sports Lifestyle USA, LLC v. Old Navy, LLC*, No. SACV 12-572 JVS (Ex), 2014 WL 1246497, at *2 (C.D. Cal. Mar. 21, 2014).[13]

adidas' delay in seeking a preliminary injunction further weighs against finding irreparable harm, as two of the three accused Skechers styles have been on the market for nine months or more. Kartalis Decl. ¶¶ 15, 19; *see Playboy*, 55 F. Supp. 2d at 1090 (no irreparable harm given five-month delay in seeking injunctive relief); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (three-month delay).

## III.    THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN SKECHERS' FAVOR

As with *Winter*'s irreparable harm requirement, adidas also erroneously asks the Court to presume the "balance of hardships" requirement favors adidas from its showing on the merits, relying exclusively on case law that predates *Winter* and *Herb Reed* by decades. Mot. at 34-35. Setting aside adidas' arguments regarding the dubious merits of its case, adidas has offered no evidence showing "why preliminary injunctive relief is necessary to maintain its brand's positive reputation and goodwill." *JL Beverage Co. v. Beam, Inc.*, 899 F. Supp. 2d 991, 1011 (D. Nev. 2012).

Turning to the other side of the balance, adidas also gives short shrift to the harm Skechers will suffer if a preliminary injunction were to issue. Because Skechers' footwear business is trend-oriented, most styles have a useful shelf life of one or two selling seasons, or approximately six to twelve months. Kartalis Decl. ¶ 26. If Skechers were required to immediately cease all sales of the accused shoe styles during the pendency of this case, it is likely they would no longer be in style when this case ends and would be sellable, if at all, only at very substantial discounts. *Id.* ¶ 27. Thus, an injunction would cause Skechers significant lost

---

[13] adidas contends that previous settlements between adidas and Skechers demonstrate "that a preliminary injunction is critical to prevent further irreparable harm." Mot. at 25. On the contrary, these settlements demonstrate no irreparable harm, as they expressly include provisions that allow Skechers to continue to sell off remaining accused merchandise (for up to ten months in some instances), suggesting Skechers' continued sale of accused products is unlikely to irreparably injure adidas. Paccione Decl. ¶ 8.

PAGE 48 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

revenues. An injunction would also harm Skechers' business reputation by creating the perception that Skechers had violated adidas' rights, despite such allegations being unproven. This, in turn, would likely hurt Skechers' relationships with its third-party retail accounts. *Id*. ¶ 28. These reputational harms to Skechers from an injunction are difficult to quantify, and will likely not be compensable if and when Skechers ultimately prevails on summary judgment or at trial.

## IV.    A PRELIMINARY INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST

As with irreparable harm and balance of hardships, adidas asks the Court to infer that this factor favors adidas from its showing on the first *Winter* factor, citing only pre-*Winter*, pre-*Herb Reed* case law. *See* Mot. at 37 (contending that "a preliminary injunction serves the public interest" because Skechers "is likely to create consumer confusion"). The Ninth Circuit has expressly rejected arguments that all four *Winter* factors may be "collapse[d] into the merits." *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011). Because adidas has failed to produce any evidence that an injunction would serve the public interest, adidas' motion should be denied.

Furthermore, the requested preliminary injunction would ***not*** serve the public interest, as it would adversely affect the rights of many third parties, including retailers that sell Skechers shoes. Specifically, it is highly likely (and, indeed, adidas' likely objective) that a preliminary injunction would inequitably discourage retailers from selling Skechers' shoes. Accordingly, injunctive relief should be denied on this ground as well. *See, e.g.*, *Horwitz v. Sw. Forest Indus., Inc.*, 604 F. Supp. 1130, 1135-36 (D. Nev. 1985).

## CONCLUSION

adidas' motion—in which it fails to carry the most basic burdens of proof and relies on "guesstimations," hearsay, and speculation in seeking the drastic remedy of a preliminary injunction—is baseless. adidas owes Skechers and this Court an apology for filing it. For the foregoing reasons, the Court should deny adidas' motion.

PAGE 49 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

DATED:  November 9, 2015

LANE POWELL PC


By   s/ Parna Mehrbani
    Kenneth R. Davis II, OSB No. 971132
    Parna A. Mehrbani, OSB No. 053235
    Telephone: 503.778.2100

O'MELVENY & MYERS LLP
Daniel M. Petrocelli (*pro hac vice*)
dpetrocelli@omm.com
Mark A. Samuels (*pro hac vice*)
msamuels@omm.com
Jordan Raphael (*pro hac vice*)
jraphael@omm.com
400 South Hope Street, Suite 1800
Los Angeles, California  90071
Telephone:  213.430.6000

Attorneys for Defendant Skechers USA, Inc.

PAGE 50 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## LR 7-2(b) CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) and this Court's Order in ECF No. 44 because it contains 11,997 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: November 9, 2015

LANE POWELL PC

By  s/ Parna Mehrbani
    Kenneth R. Davis II, OSB No. 971132
    Parna A. Mehrbani, OSB No. 053235
    Telephone: 503.778.2100

O'MELVENY & MYERS LLP
Daniel M. Petrocelli (*pro hac vice*)
dpetrocelli@omm.com
Mark A. Samuels (*pro hac vice*)
msamuels@omm.com
Jordan Raphael (*pro hac vice*)
jraphael@omm.com
400 South Hope Street, Suite 1800
Los Angeles, California  90071
Telephone:  213.430.6000

Attorneys for Defendant Skechers USA, Inc.

PAGE 51 – SKECHERS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION