IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADIDAS AMERICA, INC., a Delaware
Corporation; ADIDAS AG, a foreign
entity; and ADIDAS INTERNATIONAL
MARKETING B.V., a foreign entity,

        Plaintiffs,

    v.

SKECHERS USA, INC., a Delaware
corporation,

        Defendant.

No. 3:15-cv-01741-HZ

OPINION & ORDER

Charles H. Hooker, III
R. Charles Henn, Jr.
Kilpatrick Townsend & Stockton, LLP
1100 Peachtree St., Ste. 2800
Atlanta, GA 30309

Stephen M. Feldman
Perkins Coie, LLP
1120 NW Couch St., 10th Floor
Portland, OR 97209

      Attorneys for Plaintiff

Daniel M. Petrocelli
Jeffrey A. Barker
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067

Jordan Raphael
Mark A. Samuels
O'Melveny & Myers LLP
400 So. Hope St.
Los Angeles, CA 90071

Kenneth R. Davis, II
Parna A. Mehrbani
Lane Powell, PC
601 SW Second Ave., Ste. 2100
Portland, OR 97204

    Attorneys for Defendants

HERNÁNDEZ, District Judge:

    Plaintiff adidas makes shoes. Defendant Skechers also makes shoes. adidas asks the
Court to prevent Skechers from selling three different shoes which adidas claims are confusingly
similar to adidas's registered trademarks and protectable trade dress. The Court finds adidas is
likely to succeed in establishing its right to enforce the marks and trade dress asserted here,
including the unregistered Stan Smith trade dress. adidas is also likely to succeed in showing that
the Skechers shoes infringe adidas's marks and trade dress because the Skechers shoes are likely
to cause consumer confusion. Finally, adidas has produced sufficient evidence of irreparable
harm and the other elements required to warrant injunctive relief, and therefore, adidas's motion
for a preliminary injunction is granted.

//

//

//

BACKGROUND

adidas is one of the world's leading designers and producers of athletic footwear, apparel, and sporting equipment. Murphy Decl. ¶ 8, ECF 7. adidas began using its "Three-Stripe" logo on athletic shoes sold in the United States in the 1950s, and by the late 1960s, the company had expanded its use of the Three-Stripe mark to apparel and other merchandise. Murphy Decl. ¶ 8. The "Brand with the Three Stripes" holds numerous United States trademarks, including incontestable registrations for its "Three-Stripe" mark in various forms, and for its "Supernova" mark, which adidas uses in connection with a line of running shoes and apparel. Vanderhoff Decl. ¶¶ 3–7, ECF 9; Murphy Decl. ¶¶ 18–19.

Although its design has changed slightly over the years, the Three-Stripe mark is widely visible and well-known both on and off the playing field. adidas has sponsored (and splashed its logo across) the World Cup and the Boston Marathon, college sports teams including UCLA and the University of Nebraska, superstar athletes such as Lionel Messi, David Beckham, Aaron Rodgers, and the Portland Trail Blazer's own Damian Lilliard, and pop culture icons like Katy Perry. Murphy Decl. ¶¶ 12–13. All told, adidas spends over $38 million annually in global advertising and promotion, and annual sales of products bearing the Three-Stripe mark in the United States runs into the hundreds of millions. Murphy Decl. ¶¶ 9–10.

In the early 1970s, adidas introduced a new tennis sneaker—a sleek, white leather low-top, with rows of perforations in the shape of the familiar Three-Stripe mark enclosed by a distinctive stitching pattern, a flat white outsole, and a mustache-shaped heel patch in a bright, kelly green. Beaty Decl. ¶¶ 8–9, ECF 8. In 1973, adidas named the shoe after Stan Smith, an American tennis player who, at the time, was ranked number one in the world and had won major victories in the 1968 U.S. Open and 1970 Australian Open. Beaty Decl. ¶ 10. Since then, the Stan Smith moved from the tennis court to the street and beyond, as the shoe's clean aesthetic

won favor among tastemakers, trendsetters, and consumers around the world. An array of athletes, musicians, artists, and celebrities, have donned the Stan Smith including John Lennon, the Rolling Stones, the late David Bowie, Marc Jacobs, David Beckham, Pharrell Williams, Will Arnett, Andy Murray, Kayne West, and many more. Beaty Decl. ¶ 13. adidas claims to have sold more than 40 million pairs of Stan Smiths worldwide since its introduction. Beaty Decl. ¶ 12. Recent media pieces have dubbed the Stan Smith an "icon," a "classic of design," the "ultimate fashion shoe," and even "The Greatest Sneaker of All Time." Beaty Decl. Ex. B at 1, ECF 8-2; Beaty Decl. Ex. C at 24, 27, 30, ECF 8-3.

Skechers is an American-based footwear company that designs, develops, and markets footwear for men, women, and children. Kartalis Decl. ¶¶ 1–3, ECF 52. Skechers is the second largest footwear company in the United States, behind Nike. Kartalis Decl. ¶ 3. Skechers sells its shoes through a network of company-owned and -operated retail stores, along with department and specialty stores across the United States and around the world. Kartalis. Decl. ¶ 4. To distinguish itself in the highly competitive and trend-driven footwear industry, Skechers adopted a "serial branding strategy," meaning it "heavily and consistently brands its shoes, packaging, and retail stores with the SKECHERS trademark." Kartalis Decl. ¶¶ 5–6. Part of Skechers' strategy includes a process it calls "Skecherizing," whereby "its designers transform market trends into unique footwear products . . . prominently featuring Skechers' famous marks, brands, and logos . . . ." Kartalis Decl. ¶ 8.

Occasionally, this "Skecherizing" process fails, at least in part, in its aim to create unique footwear products. Since at least the mid-1990s, Skechers and adidas have regularly clashed about certain Skechers shoes with designs invoking adidas's Three-Stripe mark. In 1995, these two competitors settled a lawsuit over shoe designs with an agreement in which Skechers

acknowledged adidas's rights in the Three-Stripe mark and agreed not to infringe those rights.
Vanderhoff Decl. ¶ 8. Thus began an ongoing battle: at least six times since then, adidas found
Skechers shoes it believed to be infringing, and either sued Skechers or demanded in writing that
Skechers stop selling the shoes. Each time, the parties settled the dispute and Skechers agreed to
stop selling the challenged footwear. See Vanderhoff Decl. ¶¶ 8–14. The peace brokered through
those agreements sometimes lasted a few years, but sometimes only a few months; the parties
entered the latest agreement in April of 2013. Vanderhoff Decl. ¶ 14.

Which brings the Court to the present suit and motion. adidas has identified three current
Skechers shoes that adidas believes bear confusingly similar imitations of adidas's trademarks
and trade dress. The first is Skechers Relaxed Fit Cross Court TR, which is depicted below
alongside an adidas shoe bearing the Three-Stripe mark:

Skechers Relaxed Fit Cross Court TR          adidas Ultra Boost with the Three-Stripe Mark




Vanderhoff Decl. ¶ 18; Pl. Mot. at 4. adidas alleges that this Skechers shoe uses a "knock off" of
adidas's famous Three-Stripe mark. Pl. Mot. at 24.

//

//

//

//

The second allegedly infringing shoe, the Skechers Relaxed Fist Supernova shoe, is depicted below:



Vanderhoff Decl. Ex. I, ECF 9-9. adidas asserts that Skechers has "misappropriated adidas's well-known and federally registered Supernova mark," which adidas uses in connection with athletic shoes and apparel. Pl. Mot. at 9 (some capitalization omitted).

Finally, adidas alleges that the Skechers Onix infringes the adidas Stan Smith shoe:

Skechers Onix                        adidas Stan Smith

Vanderhoff Decl. ¶ 16; Pl. Mot. at 3. adidas contends that the Skechers Onix "blatantly reproduces adidas's famous and distinctive Stan Smith trade dress" including its shape, color, stitching, perforations, outsole, and heel patch. Pl. Mot. at 25 (some capitalization omitted).

adidas filed suit against Skechers in September of 2015 and immediately moved for a preliminary injunction. adidas contends that Skechers "is selling footwear in clear violation of adidas's incontestable rights in and to its Stan Smith trade dress . . . , Three-Stripe trademark . . . , and Supernova trademark," and "is doing so in a blatant, bad faith attempt to trade on adidas's goodwill and to profit wrongfully from consumer's confusion." Pl. Mot. at 1 (some capitalization omitted). adidas asks the Court to enter an injunction "preliminarily restraining Skechers from manufacturing, distributing, advertising, selling, or offering for sale any footwear (a) that is confusingly similar to adidas's Stan Smith trade dress, (b) bearing stripes in a manner that is confusingly similar to adidas's Three-Stripe mark, or (c) under adidas's Supernova mark." Pl. Mot. at 1–2 (some capitalization omitted).

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Resources Defense Council, 555 U.S. 7, 22 (2008). The party seeking the injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. Id. at 20. A court can only issue an injunction if the plaintiff carries its burden of persuasion by a "clear showing" of the four required elements. Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012). Because an injunction is an equitable remedy, the court may apply a sliding test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

//

DISCUSSION

**1) Skechers' Motions to Strike**

Before analyzing the merits of the motion for a preliminary injunction, the Court briefly addresses Skechers' motions to strike. First, Skechers moved to strike portions of a declaration submitted by Mr. Brandon Beaty, the Director of Sport Style Brand Marketing for adidas Originals.[1] Def. Mot. to Strike, ECF. 49. Skechers later moved to strike portions of Mr. Beaty's supplemental declaration and an expert survey submitted by adidas. Def. Mot. to Strike New Evidence, ECF 71. In its motions, Skechers argues that Mr. Beaty lacked personal knowledge to testify about adidas's advertising expenditures and sales figures for the Stan Smith, that media articles about the Stan Smith were hearsay, and that through Mr. Beaty's supplemental declaration and an expert survey, adidas improperly raised new issues in its reply briefing.

Those arguments are without merit, and Skechers' motions to strike are denied. In deciding a motion for a preliminary injunction, the Court has broad discretion to consider all arguments and evidence, including hearsay and other inadmissible evidence, declarations from interested parties, and arguments raised for the first time in a reply. Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009); Lane v. Dep't of Interior, 523 F.3d 1128, 1140 (9th Cir. 2008).

Mr. Beaty is the executive in charge of the marketing division which promotes the Stan Smith. His personal knowledge and competence to testify about the marketing and sales of the Stan Smith shoe can be inferred from his position and his participation in this proceeding. Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990). Also, Skechers had ample opportunity to cross examine Mr. Beaty and the author of adidas's expert survey at the Court's evidentiary hearing on December 15, 2015. See, e.g., Sun Microsystems, Inc. v.

---

[1] adidas Originals is one branch of adidas's so-called "Sport Style" division, which includes all adidas products not designed for use on the court or field of play, or as Mr. Beaty described it: "everything lifestyle [or] casual[.]" Transcript of Preliminary Injunction Hearing at 41 (hereinafter "Tr."), ECF 81.

Microsoft Corp., 21 F. Supp. 2d 1109, 1118 (N.D. Cal. 1998) vacated on other grounds by 188 F.3d 1115 (9th Cir. 1999) (denying motion to strike new argument from reply brief because the moving party "had ample opportunity to mitigate any prejudice it now claims during the two-day evidentiary hearing" the court conducted before issuing a preliminary injunction).

Finally, Skechers' arguments against adidas's survey attack its probative value; the Court will evaluate the evidence as part of its merits analysis, not at a motion to strike.

## 2) Likelihood of Success on the Merits

To succeed on its motion for a preliminary injunction, adidas must demonstrate a likelihood of success on the merits of its claims. adidas alleges that Skechers is selling shoes with marks confusingly similar to three of adidas's marks: the Three-Stripe mark, the Supernova mark, and the Stan Smith trade dress. adidas also asserts a claim of trademark dilution regarding its Three-Stripe mark and Stan Smith trade dress.

### a) Trademark Infringement

"The Lanham Act creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1030 (9th Cir. 2010) (citing 15 U.S.C. § 1051 et seq.). An infringement claim under the Lanham Act requires the plaintiff to show (1) it has a valid, protectable trademark, and (2) that defendant's product or service creates a likelihood of consumer confusion. Applied Info. Scis. Corp. v. eBay, Inc., 511 F.3d 966, 969 (9th Cir. 2007) (citation omitted); Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1258 (9th Cir. 2001).

//

//

**i) Whether adidas Holds Valid and Enforceable Marks**

A mark registered under Section 2 of the Lanham Act is presumed valid, and the holder of a registered mark is presumed to have the exclusive right to use it in commerce. Applied Info, 511 F.3d at 969. After five years of continuous use, a registered mark is ordinarily deemed incontestable. Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000) (citing 15 U.S.C. §§ 1057(b), 1065); see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 205 (1985) (holding that incontestable trademark registration is "conclusive evidence" of the owner's exclusive right to use the mark).

Skechers does not dispute that adidas holds incontestable trademark registrations for the Three-Stripe and Supernova marks. Vanderhoff Decl. ¶¶ 3–7; Exs. B and D. Accordingly, the Court finds the Three-Stripe and Supernova marks are valid and enforceable.

The key question is whether adidas's unregistered Stan Smith trade dress is valid and enforceable under the Lanham Act. An unregistered mark or trade dress, while not entitled to a presumption of validity, may still be protectable if its holder can demonstrate it is both 1) distinctive, and 2) nonfunctional. See Wal-Mart, 529 U.S. at 210; Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1046–47 (9th Cir. 1998).

**(1) Whether the Stan Smith Trade Dress is Distinctive**

Although the Lanham Act does not explicitly require a showing that a trade dress is distinctive, "courts have universally imposed that requirement, since without distinctiveness the trade dress would not cause confusion as to the origin, sponsorship, or approval of the goods[.]" Adidas-Salomon AG v. Target Corp., 228 F. Supp. 2d 1192, 1205 (D. Or. 2002) (hereinafter "Target") (quoting Wal-Mart, 529 U.S. at 210) (internal quotation marks and alterations omitted). Since "distinctiveness" is a prerequisite for registration of a mark under Section 2 of

the Lanham Act, the question of whether a mark is distinctive is "for the most part applicable in determining whether an unregistered mark is entitled to protection[.]" Wal-Mart, 529 U.S. at 210 (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992)).

A mark is distinctive if it is either 1) inherently distinctive, or 2) has acquired distinctiveness through secondary meaning. Id. at 210–11. "[A] a mark is inherently distinctive if its intrinsic nature serves to identify a particular source," such as "Camel" cigarettes, "Kodak" film, or "Tide" laundry detergent. Id. at 210 (internal quotation omitted). A mark acquires secondary meaning when "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." Id. at 211 (quotation and alteration omitted); see also Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir. 1989) ("A product configuration has secondary meaning if the purchasing public associates that configuration with a particular source.").

Whether a particular trade dress has acquired secondary meaning is a question of fact. Clicks Billiards, 251 F.3d at 1262. That inquiry is guided by a number of factors, including (1) whether actual purchasers associate the dress with the source, which can be shown through customer surveys[2]; (2) the degree and manner of advertising of the trade dress; (3) the length and manner of use of the dress; (4) whether the party seeking protection has used the trade dress exclusively; (5) sales success of the trade dress; and (6) attempts by others to imitate. Target, 228 F. Supp. 2d at 1207 (citing Clamp Mfg. Co., 870 F.2d at 517; Clicks Billiards, 215 F.3d at 1266; Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc., 65 F.3d 1063, 1071 (2d Cir. 1995)).

---

[2] Skechers overstates the law when it claims that "expert surveys of consumers 'provide the most persuasive evidence on secondary meaning[.]" Def. Resp. at 8–9 (quoting Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir. 1985)). What the case actually says is "[a]n expert survey of purchasers *can* provide the most persuasive evidence on secondary meaning." Levi, 778 F.2d at 1358 (emphasis added). This is a subtle but crucial distinction.

Additionally, "[e]vidence of extensive unsolicited media coverage supports a finding of secondary meaning." Lisa Frank, Inc. v. Impact Int'l, Inc., 799 F. Supp. 980, 993 (D. Ariz. 1992) (citing Harlequin Enterprises Ltd. v. Gulf & Western Corp., 644 F.2d 946, 950 (2d Cir. 1981)).

adidas is likely to succeed in showing that the Stan Smith has acquired distinctiveness through secondary meaning. Since the early 1970s, adidas has used the Stan Smith mark exclusively and has expended significant capital and human resources promoting the shoe and its appearance. adidas executive Mr. Beaty testified about adidas's extensive marketing and promotion of the Stan Smith; in the past two years, adidas spent over $1 million in online and traditional advertising for the shoe. Supp. Beaty Decl. ¶¶ 4–6, ECF 67. adidas engages in extensive social media and other online campaigns to drive consumer engagement around the Stan Smith. Supp. Beaty Decl. ¶¶ 12–13. adidas also reaps significant but difficult-to-quantify value from placing the Stan Smith with celebrities, musicians, athletes, and other "influencers" to drive consumer hype. For example, supermodel Giselle Bundchen flaunted the shoe for a provocative photoshoot for Vogue Magazine, and music superstar Pharrell Williams sported a pair at the Academy Awards. Supp. Beaty Decl. ¶¶ 7–11. Mr. Beaty estimated the value of these advertising and promotional efforts since the Stan Smith's launch ran into the tens of millions of dollars. Supp. Beaty Decl. ¶ 15.

Mr. Beaty testified that adidas has sold 40 million pairs of Stan Smiths worldwide, totaling tens of millions in sales. Beaty Decl. ¶¶ 8–14. In 2014 and 2015 alone, adidas sold nearly 430,000 pairs of Stan Smiths, with a wholesale value of almost $20 million. See Supp. Beaty Decl. ¶¶ 19. These significant sales and advertising expenditures are evidence of the Stan Smith's secondary meaning. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1016 (9th Cir. 1985) (noting that $5 million in sales was "significant" in analyzing secondary

meaning); <u>Givenchy S.A. v. BCBG Max Azria Grp., Inc.</u>, No. CV 10-8394-GHK SHX, 2012

WL 3072327, at *6 n.7 (C.D. Cal. Apr. 25, 2012) ($20 million in sales and "hundreds of

thousands of dollars" spent in advertising was circumstantial evidence that supported a finding of

secondary meaning); <u>Target</u>, 228 F. Supp. 2d at 1208 (evidence of adidas's print advertising,

active product placement, and "large" sales figures supported a finding of secondary meaning).

adidas submitted numerous earned media articles and other clips from a range of sources

as evidence of the iconic nature of the Stan Smith. One article announces the Stan Smith as

2014's "Shoe of the Year." Beaty Decl. Ex. A. Another explains "Why the adidas Stan Smith is

the Most Important Sneaker of All-Time." Beaty Decl. Ex. B. Yet another spotted celebrities like

David Beckham, Kendall Jenner, and Gwen Stefani sporting the Stan Smith as their sneaker of

choice in the summer of 2015. Beaty Decl. Ex. C at 10. The Stan Smith popped up as number

four on a list of the "50 Greatest Tennis Sneakers of All Time," Beaty Decl. Ex. C at 127, as one

of the most Influential Sneaker Sponsorships in Sports History, Beaty Decl. Ex. C at 172, and as

number one on a list of the "10 Greatest Ever Trainers" (and noted favorite of the Thin White

Duke-era of the late David Bowie). Beaty Decl. Ex. C at 78. adidas provided articles mentioning

the Stan Smith from such well-known outlets as *The New York Times*, *Vanity Fair*, *The Wall

Street Journal*, *Time Magazine*, *Boston Globe*, and more. Beaty Decl. Ex. C, Supp. Beaty Decl.

Exs. D, N. The Stan Smith even got a shout out from hip-hop mogul Jay-Z on his album *The

Blueprint*: "Lampin' in the Hamptons, the weekends man; the Stan Smith adidas and the

Campus." Supp. Beaty Decl. ¶ 14. These articles and pop culture references lend further support

to the conclusion that the Stan Smith has acquired distinctiveness through secondary meaning.

<u>Target</u>, 228 F. Supp. 2d at 1209 ("numerous unsolicited media references evidencing the 'cult'

and 'hip' status of the [trade dress] . . . give rise to a factual inference that the [trade dress] has

acquired distinctiveness."); <u>adidas-Am., Inc. v. Payless Shoesource, Inc.</u>, 546 F. Supp. 2d 1029,

1057–58 (D. Or. 2008) (hereinafter "<u>Payless</u>") ("adidas' extensive evidence of unsolicited media

attention supports a finding of secondary meaning.") (citing <u>Golden Door, Inc. v. Odisho</u>, 646

F.2d 347, 350–51 (9th Cir. 1980)); <u>Lisa Frank</u>, 799 F. Supp. 993. (D. Ariz. 1992).

Notably, Skechers own conduct suggests the Stan Smith has acquired distinctiveness

through secondary meaning. The Skechers website was programmed in such a way that users

who searched for "adidas stan smith" were directed to the page featuring the Skechers Onix shoe.

Vanderhoff Decl. ¶ 17, Exs. G & H. The only reason "adidas stan smith" is a useful search term

is that consumers associate the term with a distinctive and recognizable shoe made by adidas.

<u>See</u> <u>Clamp Mfg.</u>, 870 F.2d at 517 ("A product configuration has secondary meaning if the

purchasing public associates that configuration with a particular source.").

Finally, the Ninth Circuit has noted that "[p]roof of exact copying, without any opposing

proof, can be sufficient to establish secondary meaning [since] there is no logical reason for the

precise copying save an attempt to realize upon a secondary meaning that is in existence."

<u>Target</u>, 228 F. Supp. 2d at 1209 (quoting <u>Transgo</u>, 768 F.2d at 1016). Although Skechers points

out minor differences between its Onix shoe and the Stan Smith—that the Onix has five, not

three, rows of perforations which extend in a different direction, and that its colored heel patch is

a slightly darker shade of green—the unmistakable overall impression is two nearly identical

shoes. The reasonable inference to draw is that Skechers copied the overall look of the adidas

shoe to realize upon the Stan Smith's secondary meaning. <u>Transgo</u>, 768 F.2d at 1016; <u>Target</u>,

228 F. Supp. 2d at 1209 ("The court need not resolve the parties' debate over whether

defendants' shoes are sufficiently 'exact' copies to be termed 'knock offs.' . . . [E]ven a cursory

look at the shoes indicates that the trade dress of defendants' shoes incorporates significantly more similarities to, than differences from, [plaintiff's] Trade Dress.").

Skechers counters that adidas's use of the Stan Smith trade dress is not exclusive because many other manufacturers produce similar white shoes with perforations and a colored heel patch. Def. Resp. at 14–19. But standing alone, a list of third party shoes that use parts of the Stan Smith trade dress are not sufficient to undermine adidas's trademark rights. Boldface Licensing + Branding v. By Lee Tillett, Inc., 940 F. Supp. 2d 1178, 1191 (C.D. Cal. 2013), appeal dismissed (Aug. 14, 2013) (explaining that "third-party registrations are not probative of conceptual weakness without evidence that the marks were actually used in commerce and viewed by consumers.").[3]

Skechers also latches onto the "wide variety of styles, designs, colors, and materials" that adidas has used in making and selling the Stan Smith over the years as grounds for attacking the shoe's inherent distinctiveness. Skechers argues that these varied styles "contradict[] any claim of a cohesive, source-identifying 'Stan Smith' trade dress." Def. Resp. at 11–13. But the question is whether the specific trade dress adidas is seeking to protect has acquired secondary meaning; the variations on that theme adidas may have used in the past are not relevant. See Rose Art Indus., Inc. v. Swanson, 235 F.3d 165, 175 (3d Cir. 2000) ("when determining whether the trade dress alleged by the plaintiff is recognizable, protectable trade dress, a trial court should consider only the products or packaging for which the plaintiff is seeking trade dress protection."). adidas adds convincingly that the "limited runs of adidas footwear based on the classic Stan SmithTrade

---

[3] Tellingly, none of the numerous third party shoes Skechers provided as evidence of adidas's "nonexclusive" use of the Stan Smith is as similar to the Stan Smith as Skechers' Onix shoe. Def. Resp. at 15–17. Unlike any of the proffered examples, the Skechers' Onix mimics every element of the claimed trade dress, and is difficult to distinguish from the Stan Smith without close examination.

Dress . . . were made possible—and successful—*precisely because* the Stan Smith Trade Dress has secondary meaning in the marketplace." Pl. Reply at 14 (some capitalization omitted).

Finally, Skechers argues vigorously that adidas's failure to procure a consumer survey on the issue of secondary meaning undermines the claim that Stan Smith is protectable. See Def. Resp. at 1, 11. Skechers conducted its own survey which it asserts demonstrates the Stan Smith has no secondary meaning. Def. Resp. at 9–11. The Court is not moved. First, "direct survey evidence of purchaser perception is not required" to successfully demonstrate secondary meaning. Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1145–46 (9th Cir. 2009) (citing Clamp Mfg., 870 F.2d at 517). adidas has provided ample and convincing circumstantial evidence of secondary meaning, obviating the need for a consumer survey. Second, the control shoe used by Skechers' expert very closely resembles the Stan Smith and other shoes currently on the market. That, in turn, could artificially inflate the so-called "one brand" survey responses to the control shoe and render the survey less reliable, a fact that Skechers' expert acknowledged in her deposition. Feldman Decl. Ex B. at 15–17, ECF 63-2.

**(2) Whether the Stan Smith Trade Dress is Nonfunctional**

adidas must also show that the Stan Smith trade dress is nonfunctional. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 164 (1995). Control over functional features is governed by patent law, which is designed to "encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation." Id. It is important to guard against the overlap of patents and trademarks because if a product's functional features could be

trademarked, the holder could obtain a monopoly "over such features . . . without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity)." Id. at 164–65. (citations omitted).

"Functional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." Target, 228 F. Supp. 2d at 1202 (quoting Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir. 1987)). "In general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Id. (quoting Qualitex, 514 U.S. at 165 (internal quotation marks omitted)). Although courts in the past have also asked whether the trade dress is "aesthetically functional," the Ninth Circuit (the circuit from which the doctrine originated) has all but abandoned that question as true test for functionality. Id. (citing Click Billiards, 251 F.3d at 1260). Instead, the Ninth Circuit considers four functional factors: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998).

Skechers attacks several individual elements of the Stan Smith trade dress as "functional," and thus not entitled to protection. For example, Skechers argues that the rows of perforations "provide the utilitarian advantages of ventilation and flexibility," and that Stan Smith is white "because tennis competitions traditionally require players to wear white, leaving

competitors with no alternative designs to a predominantly white upper and outsole." Def. Resp. at 23–25. The Ninth Circuit has repeatedly rejected this "divide and conquer" approach to analyzing functionality. Clicks Billiards, 251 F.3d at 1259 (explaining that when assessing functionality, courts must "focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."); see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987) ("[O]ur inquiry is not . . . whether individual elements of the trade dress fall within the definition of functional, but . . . whether the whole collection of elements taken together are functional.")

When analyzed as a whole, the combination of the Stan Smith's claimed features—a classic tennis shoe profile with a sleek white leather upper, three rows of perforations in the pattern of the well-known Three-Stripe trademark, defined stitching enclosing the perforations, a raised mustache-shaped colored heel patch, and a flat tonal white rubber outsole—are not functional. There is no utilitarian advantage gained from using the Stan Smith's particular set of features because they do not make the shoe work better or cost less than other similar sneakers in the current marketplace. Target, 228 F. Supp. 2d at 1202. Competitors can make a viable sneaker without utilizing the specific combination of elements that comprise the Stan Smith. See Fuddruckers, 826 F.2d at 842 ("A restaurateur cannot prevent others from using any particular color or feature, but can protect a combination of visual elements 'that, taken together, . . . may create a distinctive visual impression.' "). Indeed, Skechers' own briefing makes clear that numerous other sneaker makers have designed a retro tennis sneaker without incorporating all the Stan Smith's elements. Def. Resp. at 15–17; Disc Golf Ass'n, 158 F.3d at 1006 (explaining that functionality depends in part on "whether alternative designs are available.").

The claimed trade dress in the Target case from this district had a similar combination of features: "1) three stripes on the side of the shoe parallel to equidistant small holes; (2) a rubber "shell toe;" (3) a particularly flat sole; and (4) a colored portion on the outer back heel section (referred to by the parties as a 'heel patch' or 'color moustache')." Target, 228 F. Supp. 2d at 1199. After rejecting the defendants' attempt to "divide and conquer" the individual elements, Magistrate Judge Stewart and District Judge Redden[4] concluded that the "when all of the elements of the Original Superstar shoe's trade dress were taken together, they were nonfunctional and therefore protectable." Id. at 1194–95. The claimed features of the Stan Smith, when analyzed as a whole, are similarly not functional.

### ii) Likelihood of Confusion

Having determined that adidas is likely to succeed in establishing that the Stan Smith is a valid and protectable trade dress, the Court turns to the "core element" of adidas's trademark infringement claims: whether the Skechers shoes are "likely to confuse customers about the source of the products." Multi Time Mach., Inc. v. Amazon.com, Inc., 804 F.3d 930, 933 (9th Cir. 2015) (quoting E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290 (9th Cir. 1992)). "In the Ninth Circuit, neither an intent to confuse, nor actual confusion are required elements of a trademark infringement claim." Payless, 546 F. Supp. 2d at 1051 (citing Brookfield Comm., Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1050 (9th Cir. 1999); Coca–Cola Co. v. Overland, Inc., 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). The key question is whether the two marks are sufficiently similar that a "reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998) (internal

---

[4] Judge Stewart's opinion in Target was issued as a Findings & Recommendation; after reviewing the parties' objections, Judge Redden adopted the Findings & Recommendation with some additional reasoning.

quotation marks omitted). Courts evaluate the likelihood of confusion by examining the "total effect of the defendant's product and packaging on the eye and mind of an ordinary consumer." Payless, 546 F. Supp. 2d at 1052 (quoting First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383–84 (9th Cir. 1987).

Consumer confusion can arise in a variety of contexts including point-of-sale (confusing the source at the time of purchase), post-sale (confusing someone other than the purchaser), and even "initial interest" (using a confusingly similar mark to capture a buyer's attention). Internet Specialties W., Inc. v. ISPWest, No. CV05-3296FMCAJWX, 2006 WL 4568053, at *3 (C.D. Cal. Aug. 2, 2006); Target, 228 F. Supp. 2d at 1211–12 (citations omitted). No matter the type of confusion alleged, courts in the Ninth Circuit analyze eight factors, commonly called the "Sleekcraft factors," to evaluate the likelihood of confusion:

> (1) the similarity of the marks; (2) the relatedness or proximity of the two companies' products or services; (3) the strength of the registered mark; (4) the marketing channels used; (5) the degree of care likely to be exercised by the purchaser in selecting goods; (6) the accused infringers' intent in selecting its mark; (7) evidence of actual confusion; and (8) the likelihood of expansion in product lines.

Interstellar Starship Servs., Ltd. v. Epix, Inc., 304 F.3d 936, 942 (9th Cir. 2002) (citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 346 (9th Cir. 1979)); Payless, 546 F. Supp. 2d at 1052 (citing Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1404 (9th Cir. 1997) (explaining that the Sleekcraft factors are used "in all trademark infringement cases.")). Despite its universal application, the Sleekcraft factor test is not a rigid one, and "[o]ther variables may come into play depending on the particular facts presented." Sleekcraft, 599 F.2d at 348 n.11; see also Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002) ("[l]ikelihood of confusion is not determined by mechanically counting the number of factors that weigh in favor of each party, or by giving the same weight to a particular factor in each case.").

## 1. Similarity of the Marks

"The first <u>Sleekcraft</u> factor—the similarity of the marks—has always been considered a critical question in the likelihood-of-confusion analysis." <u>Payless</u>, 546 F. Supp. 2d at 1052 (quoting <u>GoTo.Com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1205 (9th Cir. 2000)). "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." <u>Id.</u> at 1052 (quoting <u>GoTo.Com</u>, 202 F.3d at 1206). The Ninth Circuit has "developed three axioms that apply to the similarity analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and 3) Similarities weigh more heavily than differences." <u>Entrepreneur Media</u>, 279 F.3d at 1144.

Any reasonable observer can see the striking similarities between the Skechers Onix and the adidas Stan Smith. The Skechers Onix has a near identical shape, the same "sleek white leather upper," angled stripes comprised of perforations, the identical defined stitching pattern around the perforations, a raised green heel path, and a flat white rubber outsole. During the evidentiary hearing, both parties used the physical shoes as demonstrative exhibits; from its view, the Court could not distinguish between the two shoes, even as witnesses handled them a few feet away.

Skechers does its best to distinguish its shoe from the Stan Smith by noting the Onix has five, not three, rows of perforations angling in the opposite direction as those on the Stan Smith, and that the Onix uses a slightly different shade of green. But given the many strong similarities, these minor differences do not substantially alter the overall impression that the Skechers shoe is a knock-off of the Stan Smith. <u>See</u> <u>Payless</u>, 546 F. Supp. 2d at 1053 (explaining that it is critical to analyze the similarities of the marks as a whole, as they are "used in the marketplace, not a deconstructionist view of the different components of the marks.") (citation omitted); <u>Baker v. Master Printers Union of New Jersey</u>, 34 F. Supp. 808, 811 (D.N.J. 1940) ("[F]ew would be

stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts.").

Skechers asserts that its use of distinctive branding and packaging undercuts adidas's claim of confusing similarity. Def. Resp. at 30–32. Those could eliminate point-of-sale confusion, but in the post-sale context, similarity of the marks or trade dress is the "most important factor tending to prove confusion." Target, 228 F. Supp. 2d at 1213 (citing Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 989 (Fed. Cir. 1993). The major similarities between Skechers' Onix and adidas's Stan Smith are apparent, and in the post-sale context (that is, without the benefit of in-store signage, distinctive packaging, and logos on the bottom of the sole of the shoe), the "*overall impression* created by the marks is essentially the same, and thus it is very probable that the marks are confusingly similar." adidas Am., Inc. v. Payless Shoesource, Inc., 529 F. Supp. 2d 1215, 1235 (D. Or. 2007) ("Payless II").

Similarly, the Skechers Cross Court TR shoe incorporates a three-striped design that is very similar in overall appearance to the adidas Three-Stripe mark. Skechers again points to minor distinctions—that its three stripes are of unequal thickness with rounded corners, and that the three stripes combine at one point to form a sideways letter "E." But those minor differences do not change the overall impression of similarity between the Skechers three-striped design and adidas's Three-Stripe mark.

Finally, the Skechers Supernova mark is identical to adidas's registered Supernova mark; the conclusion that these marks are similar needs no explanation. See Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1392 (9th Cir. 1993) ("The district court assesses the similarity of marks in terms of their sight, sound, and meaning."). Skechers' use of a mark identical to

adidas's mark on an identical type of product could lead a reasonable consumer to mistakenly believe that the Skechers Supernova was licensed, authorized, or otherwise affiliated with adidas.

This factor weighs heavily in adidas's favor.

### 2. Relatedness or Proximity of the Marks

The relatedness of the goods is another key factor in the <u>Sleekcraft</u> analysis. <u>GoTo.com</u>, 202 F.3d at 1205. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." <u>Payless</u>, 546 F. Supp. 2d at 1054 (quoting <u>Brookfield</u>, 174 F.3d at 1055). "Related goods are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.' " <u>Id.</u> (quoting <u>Sleekcraft</u>, 599 F.2d at 348 n.10).

This factor also weighs strongly in adidas's favor. Both adidas and Skechers make athletic and casual footwear. The products are " 'reasonably interchangeable by buyers for the same purposes,' " and are, therefore, competitive. <u>Id.</u> (citing MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION § 24.23). Skechers attempts to distinguish its marks from adidas's by arguing that Skechers is a "lifestyle brand" that caters to a much different segment of the shoe-buying public than adidas's "athletic" brand. Def. Resp. at 40–41. But such granularity is not required in analyzing the goods' proximity. <u>See</u> <u>Payless</u>. 546 F. Supp. 2d at 1054 ("Here, the parties' products are essentially identical in use and function. Both parties sell athletic and casual footwear."); <u>Target</u>, 228 F. Supp. 2d at 1213 (the proximity factor "favors adidas since defendants are using a four stripe design on a nearly identical product of athletic shoes."). If all of Skechers' challenged shoes were sold under adidas's mark, the public would reasonably assume all of the shoes came from adidas. <u>Sleekcraft</u>, 599 F.2d at 348 n.10. Thus, they are

related, and the substantial similarity between the marks weighs in favor of finding a likelihood of confusion. <u>Payless</u>, 546 F. Supp. 2d at 1054.

### 3. Marketing Channels Used

The similarity of the marks, relatedness of the goods, and this third factor, the "use of a common marketing channel" are the key factors in the <u>Sleekcraft</u> analysis. <u>GoTo.com</u>, 202 F.3d at 1205 (referring to these first three factors as the "controlling troika").

Skechers' primary argument here mirrors its argument about the proximity of goods: that Skechers shoes are targeted at a different sub-market of sneaker purchasers than adidas's shoes. Def. Resp. at 40–41. The analysis on this factor, however, should be framed much more broadly. For example, the court in <u>Sleekcraft</u> found that "[a]though different submarkets are involved, the general class of boat purchasers exposed to the products overlap." 599 F.2d at 353. Each boat maker sold their products through "parallel" marketing channels, such as sales "through authorized retail dealers in diverse localities," using the "same sales methods," "almost identical" price ranges, and through similar advertisements in "local newspapers and classified telephone directories." <u>Id.</u>

adidas produced evidence that its shoes and Skechers shoes can be found at the same stores. Murphy Decl., ECF No. 7, ¶ 22; Beaty Decl. ECF No. 8, ¶ 18. Moreover, even if Skechers could show the marketing channels were "completely incongruous, . . . this factor would not necessarily favor [Skechers] because channels of trade are largely irrelevant in determining the likelihood of *post*-sale confusion." <u>Payless</u>, 546 F. Supp. 2d at 1055 (citing <u>Reebok</u>, 998 F.2d at 989–90). Accordingly, this factor also weighs in adidas's favor.

### 4. Strength of the adidas Marks

The scope of protection afforded a trademark "depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones." <u>Id.</u> (quoting <u>Entrepreneur</u>

Media, 279 F.3d at 1141). A mark's "strength" depends on its conceptual and commercial strength. GoTo.com, 202 F.3d at 1207. Conceptual strength is based on the mark's placement "along a spectrum of increasing distinctiveness. From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." Id. (internal citation omitted).

adidas's Three-Stripe mark is conceptually strong because it is arbitrary. adidas-Salomon AG v. Target Corp., No. CIV.01-1582-RE, 2003 WL 25710435, at *6 (D. Or. Jan. 29, 2003) ("Target II") ("The adidas three-stripe marks are arbitrary because three stripes do not define, describe or suggest the various products that bear them."). Numerous judges have concluded that the Three-Stripe mark is strong and entitled to protection, and this Court agrees. Payless, 546 F. Supp. 2d at 1056; Target, 228 F. Supp. 2d at 1212; ACI Int'l Inc. v. Adidas-Salomon AG, 359 F. Supp. 2d 918, 921 (C.D. Cal. 2005). The commercial strength of adidas's Three-Stripe mark cannot be contested. adidas produced evidence of billions of dollars in sales of products bearing the Three-Stripe mark worldwide, of tens of millions spent in advertising the mark, and numerous, unsolicited media mentions referencing the "iconic" symbol. Murphy Decl. ¶¶ 8–17, Ex. D. All of these are legitimate ways to demonstrate a mark's strength. Payless, 546 F. Supp. 2d at 1056 ("adidas's substantial advertising and promotional efforts are significant evidence of the strength of its mark."); Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1179 (9th Cir. 1988) ("Evidence of the strength of Century 21's mark includes the fact that it has expended several million dollars in advertising real estate services rendered in connection with the 'Century 21' mark, and that the mark has been used in connection with real estate sales in excess of one billion dollars.").

The Stan Smith is also arbitrary and is therefore conceptually strong. <u>Target II</u>, 2003 WL 25710435 at *6. As for its commercial strength, the Court notes the overlap between the tests for commercial strength and for distinctiveness through secondary meaning, and concludes that adidas's evidence of the Stan Smith's sales, adidas's advertising expenditures, and numerous unsolicited media mentions of the Stan Smith are sufficient to establish the Stan Smith's commercial strength. <u>See</u> <u>Payless</u>, 546 F. Supp. 2d at 1056–57 (using the "secondary meaning" analysis to measure the commercial strength of adidas's marks).

The Supernova mark is also strong. It too is arbitrary and its conceptual distinctiveness is demonstrated by its incontestable federal registration. Pl. Mot. 29. Skechers' argument that an "incontestable mark can nonetheless be weak and subject to relatively narrow protection" is true, at least as far as it goes. Def. Resp. at 27 (citing <u>Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.</u>, 856 F.2d 1445, 1449 (9th Cir. 1988)). The <u>Miss World</u> court merely refuted an argument that an incontestable registration conclusively established the mark's strength in the <u>Sleekcraft</u> analysis. The <u>Miss World</u> court then restated that a mark's <u>Sleekcraft</u> strength must be measured by both its distinctiveness and commercial strength. <u>Id.</u> ("Placement on the spectrum of distinctiveness does not end the enquiry as to the strength of a mark: it is only the first step. The second step is to determine the strength of this mark in the marketplace."). Where, as here, a registrant can show a mark is incontestably distinctive and that the mark enjoys commercial strength—demonstrated, again, by evidence of the Supernova mark's sales, adidas's advertising expenditures, and unsolicited media coverage—the mark is strong. Murphy Decl. ¶¶ 19–20, Ex. E (explaining that adidas has invested hundreds of thousands of dollars promoting goods under the Supernova mark, resulting in hundreds of thousands of pairs sold and millions of dollars in sales, and providing numerous media articles).

### 5. Degree of Care Likely Exercised by Purchasers

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." Payless, 546 F. Supp. 2d at 1059 (quoting Sleekcraft, 599 F.2d at 353). A more expensive product begets a more sophisticated customer whom courts expect to exercise a higher degree of care. Id. (citing Sleekcraft, 599 F.2d at 353); MCCARTHY § 23:96 ("The reasonably prudent buyer is assumed to take more care in purchasing 'expensive' items which he buys infrequently, than in buying everyday, relatively inexpensive items.")).

"[P]urchasers of 'relatively inexpensive athletic and sportswear' are 'not likely to exercise a great deal of care in distinguishing between trademarks when purchasing the goods.'" Payless, 546 F. Supp. 2d at 1060 (quoting M'Otto Enters., Inc. v. Redsand, Inc., 831 F.Supp. 1491, 1502 (W.D.Wash. 1993); and citing Gucci Am., Inc. v. Action Activewear, Inc., 759 F.Supp. 1060, 1066 (S.D.N.Y. 1991) ("[T]he court has no reason to conclude that the buyers of casual sportswear represent a particularly sophisticated group of customers.")).

Skechers cites a line from adidas's 2013 annual report which allegedly refers to the "sophistication" of some of its customers as evidence of the high degree of care footwear purchasers exercise in buying shoes. Def. Resp. at 40. But the citation does not match up with the submitted evidence, and even assuming the report says what Skechers claims, the Court views such a passing reference as akin to marketing "puffery" and not sufficient to establish that sneaker purchasers are sophisticated as a matter of law. Moreover, that same exhibit shows the Stan Smith being sold for seventy-five dollars, suggesting it is a low-cost, everyday good that does not invite the careful consideration of, for example, a boat. Sleekcraft, 599 F.2d at 353 ("Both parties produce high quality, expensive goods. According to the findings of fact, the boats

'are purchased only after thoughtful, careful evaluation of the product and the performance the purchaser expects.' "). This factor, therefore, favors adidas.

### 6. Skechers' Intent in Selecting its Mark

An "intent to confuse consumers is not required for a finding of trademark infringement." Brookfield, 174 F.3d at 1059 (citations omitted). Still, "[t]he law has long been established that if an infringer adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities." Id. (quotation omitted). "When one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived." Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991) (citing Sleekcraft, 599 F.2d at 354).

This factor strongly favors adidas. Skechers cannot deny that it knew the Stan Smith existed—Skechers used the terms "adidas stan smith" and "adidas original" in the source code for its webpage promoting its Onix shoe. Vanderhoff Decl. ¶ 17. And given the striking similarity between the shoes, there is but one inference to draw: that Skechers knowingly adopted a mark very similar to the Stan Smith to draw off of the success of adidas's iconic shoe. Similarly, Skechers knew that adidas owns numerous incontestable registrations for the Three-Stipe mark (a knowledge based, at least in part, on the numerous prior disputes between these parties), and yet Skechers' Cross-Court shoe incorporated a design that is very similar to adidas's well-known mark. And finally, the Court can infer Skechers' bad faith from its use of a mark identical to adidas's Supernova mark on the identical subset of goods, that is, running shoes.

Skechers cites a recent Ninth Circuit case for the proposition that it is improper to find bad faith from its use of keywords associated with adidas's marks. Def. Resp. at 39 (citing Multi Time, 804 F.3d at 938–39). The plaintiff in Multi Time was a luxury watch maker ("MTM") that

did not sell its watches on Amazon.com. Id. at 933. A search for "mtm special ops" watches on Amazon.com returned a results page which listed several other brand's watches that were similar to MTM's tactical-style watches, but the results page did not clearly indicate that MTM watches were not available for purchase. Id. at 933–34. MTM sued, alleging that Amazon's search results page infringed MTM's trademarks. Id. at 932–33.

The district court granted summary judgment in favor of Amazon and the Ninth Circuit affirmed. Id. at 935–36. "Because Amazon's search results page clearly labels the name and manufacturer of each product offered for sale and even includes photographs of the items," the panel reasoned, "no reasonably prudent consumer accustomed to shopping online would likely be confused as to the source of the products." Id. at 933. As for the "intent" element of the Sleekcraft analysis, the panel found it "[did] not weigh in MTM's favor" because "Amazon has designed its result page to alleviate any possible confusion about the source of the products by clearly labeling each of its products with the product's name and manufacturer." Id. at 940.

The present case is readily distinguishable. Unlike a traditional trademark infringement case, where the question is whether two competing marks are sufficiently similar to cause confusion, Amazon's "product" in question (the search page) was not a mark that competed with MTM's watches. The Multi Time court recognized these unique circumstances and noted that the "eight-factor Sleekcraft test [was] not particularly apt" in analyzing whether Amazon's search result page created confusion about the source of MTM's watches. Id. at 936. The dispute here, by contrast, falls squarely into the traditional trademark analysis. The question is not whether the Skechers *webpage* causes consumer confusion with adidas's shoes, but rather whether the Skechers *shoes* do so. Skechers' use of "adidas stan smith" or "adidas originals" in the metadata of the Skechers website strongly suggests that Skechers knew that its Onix shoe was similar to

the Stan Smith and that Skechers intended to capture consumers interested in adidas's shoe designs. Brookfield, 174 F.3d at 1064 ("Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store.").

### 7. Evidence of Actual Confusion

Evidence of actual confusion is "persuasive proof that future confusion is likely." Clicks Billiards, 251 F.3d at 1265. A party is not, however, required to prove actual confusion to succeed in a trademark infringement claim. Brookfield, 174 F.3d at 1050. Consumer surveys are one way to establish actual confusion. Fortune Dynamic, 618 F.3d at 1035 (9th Cir. 2010) (citation omitted).

Both adidas and Skechers submitted surveys which support their desired outcome in this case. Poret Decl., ECF No. 38-1 (adidas survey); Butler Decl., ECF No. 51, Exs.1–4 (Skechers survey). And both parties expended enormous effort arguing the merits and demerits of the competing surveys. adidas contends its survey was properly designed to measure post-sale confusion, and that the survey results indicate that approximately twenty percent of survey respondents were "confused into believing the Skechers Onix is put out by or with the authorization or approval of adidas[.]" Pl. Reply at 25. Skechers argues that the adidas survey is flawed because, among other things, it was constructed to hide Skechers' branding on the Onix shoes and the survey's control was poorly designed. Def. Resp. at 34–38. Skechers contends its survey tested for confusion between the Skechers Onix and Cross Court shoes, and the results showed that the majority of surveyed consumers correctly identified them as Skechers Products. Def. Resp. at 32–34. adidas attacks the Butler survey as improperly focused solely on point-of-sale confusion, and thus irrelevant to an analysis of post-sale confusion. Pl. Reply at 27–28.

The Court declines to give controlling weight to either survey on the question of actual confusion, and concludes that this element favors neither party. Given adidas's strong showing

on the other <u>Sleekcraft</u> factors that the Court has analyzed thus far, the neutrality of this factor does not preclude a finding that the Skechers shoes are likely to cause confusion. <u>See</u> <u>Network Automation, Inc. v. Advanced Sys. Concepts, Inc.</u>, 638 F.3d 1137, 1151 (9th Cir. 2011) ("actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.").

### 8. Likelihood of Product Expansion

"The last factor, 'likelihood of expansion,' is concerned with the potential for confusion which might arise if the parties have plans to expand (or further expand) into each other's markets." <u>M'Otto Enters.</u>, 831 F. Supp. at 1504. "Where two companies are direct competitors, this factor is unimportant." <u>Network Automation</u>, 638 F.3d at 1153. Given that adidas and Skechers directly compete in selling sneakers, this factor does not weigh into the analysis.

### 9. <u>Sleekcraft</u> Summary

Six of the seven relevant <u>Sleekcraft</u> factors for analyzing whether there is a likelihood of confusion favor adidas, including the three critical factors: the similarity of the marks, the relatedness of the goods, and the marketing channels used. Consequently, the Court finds adidas has demonstrated it is likely to establish on the merits that the Skechers marks are likely to confuse consumers. <u>See</u> <u>Target</u>, 228 F. Supp. 2d at 1213 (denying defendant's motion for summary judgment on the question of likelihood of confusion based on strong evidence on only three of the eight <u>Sleekcraft</u> factors).

### (2) Descriptive Fair Use Defense

Skechers contends that its use of the Supernova mark is lawful because its contested shoe uses a "cosmic color scheme resembling the colors of a supernova." Def. Resp. at 42. The Lanham Act provides a fair use defense against infringement to a party whose "use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or

services of such party, or their grogereographic origin[.]' " KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 607 (9th Cir. 2005) (quoting 15 U.S.C. § 1115(b)(4)); see also MCCARTHY, § 11:45 ("[a] junior user is always entitled to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark."). To establish the defense, the defendant must show: 1) its use of the term is not as a trademark or service mark; 2) it uses the term fairly and in good faith; and 3) it uses the term only to describe its goods or services. Cairns v. Franklin Mint Co., 292 F.3d 1139, 1150–51 (9th Cir. 2002) (citation omitted). As the degree of likely confusion between the marks increases, the likelihood that the use is fair decreases. KP Permanent Make-Up, 408 F.3d at 607–08; Restatement (Third) of Unfair Competition § 28 cmt. b (1995) ("the strength of the plaintiff's mark and the extent of likely or actual confusion are important factors in determining whether a use is fair.").

The Skechers website identifies the shoe as "Women's Relaxed Fit: Supernova" and the shoe's color as "Navy/Multi." Vanderhoff Decl., ECF No. 9, ¶ 19, Ex. I. There is no reference to the shoe's "cosmic color scheme" or any other information suggesting that "Supernova" is anything other than the name of the shoe. In other words, Skechers is using "Supernova" as a mark, not as a descriptor, and is therefore unlikely to succeed in establishing a fair use defense. The Skechers mark is identical to adidas's registered mark, and it appears on the same subset of products (athletic or running shoes), which suggests a strong likelihood of confusion that could render Skechers' use not "fair." KP Permanent Make-Up, 408 F.3d at 609 ("the degree of customer confusion remains a factor in evaluating fair use."). Finally, the long history of disputed shoe designs between these parties suggest Skechers acted in bad faith, especially considering that the "Supernova" is identical to adidas's mark and is used in connection with

identical goods. adidas is, therefore, likely to succeed in overcoming Skechers' descriptive fair use defense.

### (3) Trademark Dilution

adidas also asserts that Skechers' shoes are diluting the distinctiveness of adidas's Three-Stripe mark and Stan Smith trade dress. "Dilution . . . is 'the lessening of the capacity of a famous mark to identify and distinguish goods or services' of the owner of the famous mark such that the strong identification value of the owner's trademark whittles away or is gradually attenuated as a result of its use by another." Payless, 546 F. Supp. 2d at 1060 (quoting Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007) (quoting 15 U.S.C. § 1127)). "It is a cause of action 'invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value.' " Id. (quoting Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir. 1999)). "For this reason, the FTDA applies "only to those marks which are both truly distinctive and famous, and therefore most likely to be adversely affected by dilution." Id. (quoting Avery, 189 F.3d at 876).

To succeed on a trademark dilution claim, a plaintiff must show "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 634 (9th Cir. 2008) (citing 15 U.S.C. § 1125(c)(1)).

 "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In determining fame, the court may consider all relevant factors, including the extent and reach of advertising or publicity of the mark, the amount of sales of goods or services offered under the mark, the degree of actual recognition of the mark, and the registration status

of the mark. <u>Pendleton Woolen Mills, Inc. v. Round Up Ass'n</u>, No. 3:11-CV-592-AC, 2012 WL 2721856, at *4 (D. Or. July 9, 2012) (citing 15 U.S.C. § 1125(c)(2)(A)).

adidas has produced ample evidence of its publicity of the Three-Stripe mark, substantial sales of goods carrying the Three-Stripe mark, and that it holds incontestable registrations for the Three-Stripe mark. The Three-Stripe mark is unquestionably famous; past opinions from the District have thus held, <u>Payless</u>, 529 F. Supp. 2d at 1245; <u>Target</u>, 228 F. Supp. 2d at 1216, and this Court agrees. As discussed throughout this Opinion, adidas has also produced evidence showing that adidas has used the Stan Smith trade dress extensively and continuously since the 1970s, and spent significant resources and time in publicizing the Stan Smith, that the Stan Smith has enjoyed substantial sales success, and that the Stan Smith has been the subject of numerous media and pop culture references. This evidence supports the conclusion that adidas is likely to succeed in establishing that the Stan Smith is famous.

There are two types of dilution: by blurring or by tarnishment. <u>Jada Toys</u>, 518 F.3d at 634. "Dilution by blurring" is defined as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). The statute identifies six factors which the court may consider, along with other relevant factors, including the degree of similarity between the marks, the distinctiveness of the mark, the extent of the owner's exclusive use of the mark, the degree of recognition of the mark, the intent of the user of the similar mark, and evidence of actual dilution of the famous mark by association. <u>Pendleton</u>, 2012 WL 2721856 at *4 (citing 15 U.S.C. § 1125(c)(2)(B)). Finally, a famous mark is considered diluted by tarnishment when the reputation of the famous mark is harmed by the association resulting from the use of the similar mark. 15 U.S.C. § 1125(c)(2)(C).

Many of these elements have been previously analyzed. The overall similarity between the Skechers Onix and the adidas Stan Smith is patent; same for the similarity between adidas's Three-Stripe mark and the three stripes used on the Skechers Cross Court TR. Those striking similarities also suggest Skechers' intent to create an association between its marks and adidas's marks. The Three-Stripe mark is subject to incontestable trademark registrations, and thus is presumed distinctive, and the Court previously determined adidas is likely to succeed in proving the Stan Smith has acquired distinctiveness through secondary meaning. Finally, adidas's expert survey showed that more than twenty percent of respondents believed that the Skechers Onix shoe was made or approved by adidas, evidence that a substantial number of consumers actually associate the Skechers shoe with adidas. Poret Decl. Ex. 1 at 16.

In sum, adidas has shown a likelihood of success on its claim for trademark dilution.

## II.    Irreparable Harm

To succeed on a motion for injunctive relief, the plaintiff "must establish that irreparable harm is likely, not just possible[.]" All. for the Wild Rockies, 632 F.3d at 1131; cf. Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1311 (9th Cir. 2003) ("The law does not require the identified injury to be certain to occur, but it is not enough to identify a purported injury which is only theoretical or speculative."). Typically, a harm is considered irreparable if "remedies available at law, such as monetary damages, are inadequate to compensate for that injury[.]" eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

"Courts previously presumed the likelihood of irreparable harm whenever a plaintiff demonstrated a likelihood of success on a trademark or copyright infringement claim." Sleash, LLC v. One Pet Planet, LLC, No. 3:14-CV-00863-SI, 2014 WL 4059163, at *6 (D. Or. Aug. 15, 2014) (citing, among others, Brookfield, 174 F.3d at 1066). Recent Supreme Court opinions have, however, invalidated that presumption, and a party seeking a preliminary injunction in a

trademark case must now produce evidence showing the likelihood of irreparable harm. Id. (citing Winter, 555 U.S. at 22; eBay, 547 U.S. at 393. "In trademark cases, although '[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm,' a court making a finding of irreparable harm must ground its analysis in evidence rather than conclusory assertions or speculation." Id. (quoting Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc., 736 F.3d 1239, 1250 (9th Cir. 2013)).

adidas has produced sufficient evidence of irreparable harm to warrant injunctive relief. First, Skechers' infringement undermines adidas's substantial investment in building its brand and the reputation of its trademarks and trade dress. adidas submitted evidence showing it has spent tens of millions promoting the Stan Smith, hundreds of thousands promoting its Supernova shoes, and nearly forty million annually on goods bearing the Three-Stripe mark. Murphy Decl. ¶¶ 9, 19; Beaty Decl. ¶ 11; Supp. Beaty Decl. ¶¶ 6–15. Mr. Beaty testified to the significant, (though difficult to quantify) efforts his marketing team invested in promoting the Stan Smith through other avenues, such as social media campaigns, product placement, and earned media. Tr. at 45–50.

Skechers' attempts to "piggy back" off of adidas's efforts by copying or closely imitating adidas's marks means adidas loses control over its trademarks, reputation, and goodwill—a quintessentially irreparable injury. Herb Reed, 736 F.3d at 1250 ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm.") (citation omitted); Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp, No. 214CV01847JADVCF, 2015 WL 6501228, at *3 (D. Nev. Oct. 26, 2015) (finding irreparable harm where the plaintiff proffered evidence of its "considerable time and effort building its reputation" and the defendant's profiting from such efforts); MCCARTHY, § 30:46 ("Like

trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.").

More specifically, adidas marketing executive Mr. Chris Murphy testified that adidas has spent significant time and money in building and maintaining its perception among consumer as a premium sports brand. Tr. at 24–25. By contrast, Mr. Murphy testified that consumers perceive Skechers as a "lower end value brand. Tr. at 25. adidas's evidence indicating approximately twenty percent of surveyed consumers believed the Skechers Onix was made by, approved by, or affiliated with adidas shows that adidas's carefully constructed premium brand image is likely to be confused with or associated with Skechers' value brand. Thus, adidas has produced evidence that Skechers' continued sales of its Onix and other contested shoes will harm adidas' reputation and goodwill—harm that is not compensable by money damages. See E & J Gallo Winery v. Grenade Beverage LLC, No. 1:13-CV-00770-AWI, 2014 WL 4073241, at *14 (E.D. Cal. Aug. 15, 2014) report and recommendation adopted sub nom. E. & J. Gallo Winery v. Grenade Beverage LLC, No. 113-CV-00770-AWI-SAB, 2014 WL 5489076 (E.D. Cal. Sept. 8, 2014) (finding sufficient evidence of irreparable harm to the plaintiff's business reputation through unwanted association with defendant's perceived brand messaging); Starbucks Corp. v. Heller, No. CV 14-01383 MMM MRWX, 2014 WL 6685662, at *9 (C.D. Cal. Nov. 26, 2014) (finding irreparable harm based on the "perceived association" between the plaintiff's marks and the defendant's counterfeit goods of lower quality); see also MySpace, Inc. v. Wallace, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered irreparable.") (citing Rent–A–Center, Inc. v. Canyon Tele. & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991)).

adidas also produced evidence that Skechers' infringing footwear will diminish adidas's ability to create scarcity and drive demand for the Stan Smith. For instance, adidas purposefully limited the number of Stan Smiths on the market in 2013 in advance of a wide-ranging (and very successful[5]) "re-introduction" campaign. Tr. 44–45. Since its re-introduction, adidas strategically controls how many units of the Stan Smith are brought to the market to ensure it can drive demand for the shoe. Tr. at 59. "The worst case scenario," Mr. Beaty testified, "is that we flood the market with too many Stan Smiths. The result is they start going on sale. The result is that everybody has them, . . . and demand goes down. The perception of it being premium goes down." Tr. at 44. Skechers' infringing shoe undermines these efforts, creating another type of irreparable harm. See CytoSport, Inc. v. Vital Pharm., Inc., 617 F. Supp. 2d 1051, 1081 (E.D. Cal.) aff'd, 348 F. App'x 288 (9th Cir. 2009) (finding likely irreparable harm if defendant was allowed to continue "flood[ing] the marketplace" with an infringing product).

According to Mr. Beaty, the Stan Smith is one of adidas's most coveted shoes, and adidas works to control every aspect of the shoe it can, from the materials used, its price, where it is sold, and who is seen wearing it. Tr. at 57. Skechers' infringing shoes are likely to irreparably harm adidas's ability to control the quality of goods bearing adidas marks or trade dress. SunEarth, Inc. v. Sun Earth Solar Power Co., 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) (finding irreparable harm where infringing products led to mark holder's loss of quality control); Apple Inc. v. Psystar Corp., 673 F. Supp. 2d 943, 948–49 (N.D. Cal. 2009) aff'd, 658 F.3d 1150 (9th Cir. 2011) (same).

//

---

[5] In 2012, adidas sold approximately $800,000 in Stan Smith shoes. adidas pulled the Stan Smith in 2013, and sales plummeted to about $25,000. After adidas launched its "re-introduction" campaign, sales of the Stan Smith soared, reaching over $7 million in 2014, and over $12.5 million through September of 2015. Beaty Decl. II ¶ 19.

### III.    Balance of Equities

In considering whether injunctive relief is appropriate, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 129 S. Ct. at 376 (quoting Amoco Production Company v. Village of Gambell, Alaska, 480 U.S. 531, 542 (1987)); see also Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises.").

The balance of hardships here favors adidas. As explained throughout this Opinion, adidas has invested significant time, capital, and human resources in promoting and selling goods bearing its various marks. Without an injunction, Skechers can essentially free-ride off of these efforts, while at the same time undermining adidas's branding, quality control, and strategic planning. Skechers argues that, should the Court enter an injunction preventing it from selling the contested shoes, it will suffer harm both economic (because it would be prevented from selling certain shoes) and reputational (because an injunction would brand Skechers as an infringer before the Court determines the case's merits). Skechers' purported harms are not entitled to significant, if any, weight. First, Skechers makes many other shoes that are not at issue here, thus reducing the economic impact of the injunction. Second, Skechers "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." Warner Bros. Entm't Inc. v. WTV Sys., Inc., 824 F. Supp. 2d 1003, 1014–15 (C.D. Cal. 2011) (quoting Triad Systems Corp. v. Southeastern Exp. Co., 64 F.3d 1330, 1338 (9th Cir. 1995) (alterations omitted)); Cadence Design Sys. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) ("[A] defendant who knowingly infringes another's copyright cannot complain of the harm that

will befall it when properly forced to desist from its infringing activities.") (citation omitted));

Kreation Juicery, Inc. v. Shekarchi, No. CV 14-658 DMG ASX, 2014 WL 7564679, at *12 (C.D. Cal. Sept. 17, 2014) ("Moreover, any injury that Defendants may suffer as a result of the preliminary injunction may be discounted by the fact that Defendants brought the injury upon themselves by intentionally adopting a deceptively similar trademark to Plaintiff's.") (citation and quotation omitted).

## IV.    Public Interest

"A plaintiff seeking an injunction must establish that the injunction is in the public interest." Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc., 559 F.3d 985, 993 (9th Cir. 2009). "[T]he most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." Warner Bros. Entm't v. Glob. Asylum, Inc., No. CV 12-9547 PSG CWX, 2012 WL 6951315, at *23 (C.D. Cal. Dec. 10, 2012) aff'd sub nom. Warner Bros. Entm't v. Glob. Asylum, Inc., 544 F. App'x 683 (9th Cir. 2013) (quoting Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 730 (3d Cir. 2004)). "An injunction that prevents consumer confusion in trademark cases, as this injunction does, serves the public interest." Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co., 534 F. App'x 633, 636 (9th Cir. 2013) (citation omitted); Starbucks, 2014 WL 6685662, at *9. ("The most basic public interest is the public's right not to be deceived or confused.") (citation and quotation omitted).

Here, adidas has made a strong showing that it is likely to succeed in proving that Skechers is using marks that are confusingly similar or even identical to adidas's marks. Since the "very interest at issue in a trademark infringement case . . . is avoiding the public from being

confused or deceived about a product," the Court finds an injunction preventing Skechers from selling these contested products will serve the public interest.

## ORDER

For the reasons stated, Defendant's motions to strike [49] and [71] are denied. Plaintiffs' motion for a preliminary injunction [6] is GRANTED.

Dated this ___12___ day of ___February___, 2016.

MARCO A. HERNÁNDEZ
United States District Judge